FILED

2020 Oct-29  PM 02:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| MICHELLE POAGUE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 7:18-cv-00005-LSC |
| | ) | |
| HUNTSVILLE WHOLESALE | ) | |
| FURNITURE, d/b/a ASHLEY | ) | |
| FURNITURE HOMESTORE and | ) | |
| TAYLOR SWINNEY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## Memorandum of Opinion

Huntsville Wholesale Furniture (HWF) owns and operates furniture stores. Michelle Poague, Katarda Bishop, and Lorrie Acker worked at HWF's Tuscaloosa location—Ashley Furniture. All three sued HWF and their Store Manager, Taylor Swinney (Doc. 49), and HWF and Swinney counterclaimed against Acker (Docs. 50, 56, and 58).

Here, the Court considers five motions. Defendants' Motion for Summary Judgment (Doc. 124) is due to be GRANTED IN PART and DENIED IN PART. Plaintiffs' Motion for Partial Summary Judgment (Doc. 120) is due to be GRANTED IN PART and DENIED IN PART. Defendants' first Motion to Strike (Doc. 149) is due to be DENIED IN PART and TERMINATED as MOOT IN

PART. Defendants' second Motion to Strike (Doc. 158) is due to be TERMINATED as MOOT. Swinney's Opposition to Evidence (Doc. 128) is due to be TERMINATED as MOOT.

## I.    Background

At summary judgment, the Court draws "all factual inferences" in the non-moving party's favor. *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). With that in mind, the facts are as follows:

### Plaintiffs' Claims

Poague and Acker were Product Specialists. They sold furniture for $10 an hour and earned a commission for each sale. (*See* Doc. 126–75 at 16.) Product Specialists also had promotional duties. (Doc. 126–76 at 318.) On occasion, they took flyers to Tuscaloosa businesses. (*Id.*) The canvassing usually lasted an hour, but twice it lasted two hours. (*Id.*) Acker says HWF never paid Product Specialists for the monthly canvassing. (*Id.*; Doc. 138–13 at ¶ 40.)

Unlike Poague and Acker, Bishop did not work directly for HWF. (Doc. 126–97 at 2.) She worked for a staffing company, Express Services, Inc. (*Id.* at 2.) Express assigned Bishop to HWF where she was a cashier earning $10 an hour. (*Id.*)

Acker, Poague, and Bishop all claim they saw and suffered sexual harassment. Most alleged harassment involved Swinney, the Store Manager at HWF's Tuscaloosa location.

Poague contends that she heard Swinney say crude things about women "every day." (Doc. 126–33 at 2.) According to her, on more than ten occasions Swinney grabbed his testicles and said "deez nuts" to female employees. (Doc. 126–13 at 234–37.) Poague also says Swinney called attractive female customers "Omahas." (*Id.* at 225–27.) Omaha is an inside joke. (*Id.*) It means "a hot chick" or "good looking woman." (*Id.*)

Acker says Swinney and Sam Gibson, a male Product Specialist, degraded women on a "daily basis." (Doc. 49–4.) She reports that she once heard Gibson say, "Lesbians are better than faggots because women are pretty" (Doc. 126–75 at 54) and heard Swinney once call Acker attractive and told her HWF needed attractive Product Specialists like her. (*Id.* at 207–08.) Also, Acker insists that she regularly overheard vulgar conversations between Swinney and Sales Manager James Riggsby (*Id.* at 212–222) and, when she complained, Swinney replied, "If you can't take the heat, then get out of the kitchen." (*Id.* at 222.)

Acker alleges physical harassment alongside the verbal harassment. In early 2017, she says Swinney touched her three times. In January, he touched her breasts. (*Id.* at 24–25.) One month later, he touched her rear-end. (*Id.*) One month after that,

Swinney touched her breasts a second time. (*Id.*) This touching and harassment negatively impacted Acker's sales and potentially caused stress-induced ulcers. (*Id.* at 54–56.)

Bishop alleges similar behavior. She says Swinney called her his "work wife" and threw money at her like she was "a stripper or a whore." (Doc. 126–96 at 17–18.) She saw Swinney grab his genitals and scream "deez nuts" at female employees and overheard him regularly tell jokes with sexual punchlines. Once, she even allegedly saw Swinney dance provocatively while another employee threw money at him. (Doc. 49–5.)

Bishop also alleges some less offensive behavior. For instance, Swinney commented on her appearance. (*Id.* at 2–3.) He once held Bishop's hand and also hugged her after morning meetings. (Doc. 126–96 at 94.) And he once "brushed" against her back while helping a customer. (*Id.* at 26–33.)

For both offensive and less-offensive allegations, Bishop contends that she suffered consequences when she complained. In March 2017, Bishop told Mia Washington, the Office Manager, she was "uncomfortable" with Swinney's behavior. (Doc. 126–96 at 22–25.) Bishop relayed those concerns to Kim Vetrano, HWF's Regional Customer Service Manager. (*Id.*) The next month, HWF cut Bishop's hours by half. (*Id.* at 148–49.)

Swinney was not the only one alleged to act in an inappropriate manner. Poague testified that Riggsby relayed explicit details about his sex life. He told Poague a female customer wanted to "f*** his brains out." (Doc. 126–13 at 219.) He showed Poague nude pictures of that same customer. (*Id.*) Poague objected: "I said it was gross, stop." (*Id.* at 222.) Riggsby kept on, and when Poague complained to Swinney, he "laughed her complaints off." (*Id.* at 223.) According to Poague, Gibson openly discussed pornography. He even suggested Poague enjoys performing oral sex.[1] (Doc. 126–35 at 7.) Poague complained to management and, soon after, Gibson "cornered" her. (*Id.*) He warned her he "didn't want nothing to do" with her sexual harassment allegations. (*Id.*) Jason Seavers, HWF's Director of Stores, once "wrote up" Poague. (Doc. 126–33 at 2.) When she asked why, Seavers allegedly accused her of "inappropriate" involvement in "woman stuff." (*Id.*)

The Plaintiffs also contend that management favored male employees with sales. For instance, HWF uses the "Up System." If a Product Specialist is "up," he or she gets the next walk-in customer. Poague and Acker say Swinney assigned customers to male Product Specialists when female Product Specialists were next "up." (*See* Doc. 126–75 at 44.) Because Product Specialists earned commission, each lost customer means lost income. Swinney often rejected Poague's sales. (Doc.

---

[1] Poague documented the alleged conversation: "Sam said, 'that blows.' I said 'what?' He said 'you do' and laughed." (Doc. 126–19 at 7.)

126–75 at 18–21.) He said her profit margins were too low but yet approved male employees' sales at identical (or lower) profit margins. (*Id.*)

Poague says Swinney mistreated her when she returned from maternity leave. Swinney *sometimes* let Poague use his office to pump breastmilk. (Doc. 126–13 at 33–34.) Other times he offered her only the "Community Room." (*Id.* at 34.) The Community Room has cameras, and customers shop the Community Room for clearance items. (*Id.*)

According to Poague, when she asked to pump breastmilk, Swinney stared at her breasts and made her "stay on the floor for additional time." (Doc. 138–13 at ¶ 64.) In a signed declaration, Poague says:

> The more I exhibited the symptoms of discomfort and pain, the wider he would smile. If my milk leaked through my shirt, he would stare at my breasts and smile. It appeared . . . he took pleasure in my humiliation and pain. (*Id.*)

Poague asserts that HWF did not let her take federally-protected leave. Poague told Swinney she "needed leave" because her son was "not gaining weight like he should." (Doc. 126–13 at 48.) Swinney and Seavers denied her request. (*Id.*) Weeks later, a pediatrician diagnosed Poague's son with a "chronic condition." (Doc. 126–46 at 29–32.) As treatment, Dr. Kelton recommended Poague stay home for twelve weeks and nurse her son. (*Id.*) At-home nursing was necessary because Poague was "not provided [a] private place . . . at work [nor] adequate breaktime to express breastmilk, resulting in reduced supply." (*Id.* at 30.)

Eventually HWF allowed Poague to take leave. The month she returned, managers: (1) put her on an improvement plan, (2) twice split her sales with other Product Specialists, (3) rejected other sales, and (4) wrote her up each week for poor performance. (Doc. 126–36 at 3–4.)

HWF and Swinney deny many of the Plaintiffs' allegations. (*See* Doc. 133 at 1–7.) Further, HWF says it responded reasonably to inappropriate behavior, insisting that HWF policy prohibits discrimination and harassment. (Doc. 133 at 46.) HWF displayed EEOC and Department of Labor posters and offered an anonymous hotline for harassment victims. (*Id.*) And on one occasion, when Poague complained, CEO Chris Caune investigated and spoke with Swinney. (*Id.* at 47.)

Plaintiffs sued under Title VII, other federal employment-law statutes, and Alabama tort law. HWF and Swinney counterclaimed.

### Defendants' Counterclaims

Acker employment at HWF ended in March 2017. (Doc. 126–75 at 21.) Soon after, she hired lawyers and filed an EEOC discrimination charge. (Doc. 49–4.) Three months later, Acker learned that HWF fired Swinney. (Doc. 126–75 at 69.) Believing "the sexual harassment, discrimination, [and] retaliation" ended with Swinney, Acker emailed Seavers and asked for her job back. (*Id.*) Seavers responded and invited Acker to a June 2017 meeting. (*Id.* at 69–70.) Behind closed doors, she met with Seavers and Daniel Hannan, HWF's attorney. According to Hannan and

Seavers, Hannan introduced himself as HWF's attorney and then asked Acker if she was represented by counsel. Acker disagrees on both fronts. First, she says Hannan never introduced himself as HWF's attorney. Second, she believed Hannan worked with HWF's human resources department—that his purpose was to "help her get her job back." (*Id.* at 74.) She also says Hannan never asked if counsel represented her. (*Id.* at 75.)

During the meeting, Hannan and Seavers handed Acker a General Release. According to Acker, she was told, "If you want your job, sign these documents." (*Id.* at 93.) Although Acker admits no one forced her to sign, she never called her lawyer. She insists that she had no chance to read the Release before signing. (*Id.* at 83.) ("I was not allowed the time to read it."). The Release purportedly waived all of Acker's employment-law claims. (Doc. 126–89.)

One day later, HWF learned Acker (1) had counsel and (2) a pending EEOC charge. (Doc. 121–19.) Still, Acker worked at HWF for six more months. Because Acker sued—and raised purportedly-released claims—Defendants counterclaimed.

## II.    Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could

return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Instead, the trial court determines whether issues of fact remain and whether those issues deserve a trial. *See Green v. Markovitch*, 385 F. Supp. 3d 1190, 1194 (N.D. Ala. 2019).

### III.   Defendants' Motion for Summary Judgment

Defendants move for summary judgment on "all remaining claims" asserted by Plaintiffs. Defendants also move for summary judgment on their breach-of-contract counterclaims against Acker.

#### A.   Hostile Work Environment

A "hostile work environment" that changes "the terms and conditions of employment" supports a Title VII claim. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010). To prove a work environment was so hostile it changed the conditions of her employment, a plaintiff must show five elements. *Id.* at 808. First, the plaintiff must belong to a protected group. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999). Defendants do not challenge Plaintiffs on this element. Second, the plaintiff must show she was subject to unwelcome sexual harassment. *Id.* Third, the plaintiff must show the harassment "was based on [her]

sex." *Id.* Fourth, she must show "the harassment was sufficiently severe or pervasive." *Id.* Fifth, she must show some basis or reason to hold the employer liable. *Id.*

Element four has both a subjective as well as an objective component. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). The plaintiff must "subjectively perceive the environment to be abusive." *See Hulsey v. Pride Rests., LLC.*, 367 F.3d 1238, 1248 (11th Cir. 2004). Along with showing she (subjectively) believes she suffered harassment, the plaintiff must show the harassment was objectively severe or pervasive enough to alter the terms and conditions of her employment. *Harris*, 510 U.S. at 21. For this objective inquiry, courts apply four factors. *Mendoza*, 195 F.3d at 1246 (a. the frequency of the conduct; b. the severity of the conduct; c. whether the conduct is physically threatening or humiliating; and d. whether the conduct unreasonably interfered with the employee's job performance). The objective inquiry ensures Title VII does not become a "general civility code." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("Title VII . . . does not set forth 'a general civility code for the American people.'").

As to element five, the employee must show her employer is either directly or vicariously liable for the hostile work environment. *See Dees v. Johnson Controls World Servs.*, 168 F.3d 417, 421–22 (11th Cir. 1999). To hold HWF liable, Plaintiffs must show HWF (a) had actual or constructive notice of the hostile environment,

and (b) failed to take "immediate and appropriate corrective action." *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003). A plaintiff proves actual notice by proving that management knew about the harassment. *Id.* Employers have constructive notice when "harassment was so severe and pervasive that management reasonably should have known of it." *Id.*

### 1. Acker

Acker alleges the following gender-or-sex-related harassment:

- Swinney called Acker "attractive" and said HWF needed more attractive Product Specialists (Doc. 126–75 at 207–08);

- "Every time" an attractive female customer entered the store, Swinney yelled "Omaha" and followed the female customer (*Id.* at 38–40);

- When Acker scanned her fingerprint to clock in, the machine once read "69." Male coworkers commented and made fun of her (*Id.* at 208–211);

- Acker overheard Swinney call a female customer "thick enough" (*Id.* at 205–06);

- Acker once saw Swinney "twerking" like a stripper (*Id.* at 138–140);

- Acker overheard multiple sexual conversations between Riggsby and Swinney or Riggsby and other male employees. (*Id.* at 48–51.) "They would discuss [Riggsby's] previous nights, rowdy sexual endeavors, and they would refer to him as . . . Raw Dog Riggsby." (*Id.*);

- Gibson opined that "lesbians are better than faggots, because women are pretty" (*Id.* at 54);

- When Acker complained to Swinney about inappropriate conversations at work, Swinney replied "if you can't take the heat, then get out of the kitchen" (*Id.* at 222);

- Swinney touched Acker at least three times in five months. In January 2017, Swinney touched her breast. One month later, Swinney touched Acker's rear-end as he passed her. Then, in March 2017, Swinney touched Acker's breasts a second time. (Doc. 143 at 31–32);

- Swinney and Gibson talked about sex and "degraded women" at the break table "on a daily basis." (Doc. 49–4.)

Taken in the light most favorable to Plaintiff, some of these incidents (a) involved unwanted sexual harassment (b) based on Acker's sex. There is nothing to indicate that Acker wanted or encouraged the harassment. She testified the harassment "affected [her] emotional well-being," negatively impacted her sales, and (potentially) caused her to develop "stress-induced ulcers." (Doc. 126–75 at 54–56.) Acker satisfied elements two and three.

A reasonable juror could also conclude Acker subjectively found these incidents severe or pervasive enough to affect the conditions of her employment. After all, she offered evidence that the sexual harassment affected both her health and her sales. (*Id.*) Regardless, Acker must satisfy the objective prong of the fourth element. Thus, the Court turns to *Mendoza*'s four factors.

Most of the alleged harassment was not daily or near-daily. *See Reeves*, 594 F.3d at 804 (plaintiff claims she suffered harassment "on a daily basis"); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) (racial slurs "three to four times a day" is frequent harassment). But, by the *Miller* and *Reeves* standard, two allegations qualify as frequent: (1) Swinney's use of "Omaha" to flag attractive

female customers "every time" one walked in and (2) Swinney and Gibson degrading women "on a daily basis" at HWF's break table. Acker suffered (some) frequent gender-related harassment.

Some of what Acker alleges involved severe and physically threatening conduct. In *Johnson v. Booker T. Washington Broadcasting Service*, the Eleventh Circuit found severe and threatening conduct when a supervisor touched his employee sexually. 234 F.3d 501, 509 (11th Cir. 2000). Like the plaintiff in *Johnson*, Acker says her superior touched her sexually and inappropriately. She claims Swinney touched her breasts twice and rear-end once. Under *Johnson*, these three incidents create a question of fact as to whether Acker's alleged harassment was severe and physically threatening.

Evidence suggests harassment "unreasonably interfered with [Acker's] job performance." Acker testified sexual harassment "affected both her emotional wellbeing and her sales." (Doc. 126–75 at 55.) Since the Court takes such as true at this stage, this qualifies as an unreasonable job interference. *Cf. Johnson*, 234 F.3d at 509 (even inter-office friction can unreasonably interfere with a victim's job).

Finally, Acker's hostile-work environment claim satisfies element five because HWF likely had actual notice of Swinney's behavior. Again, an employer has actual notice when management "knew of the harassment." *Watson*, 324 F.3d at 1259.  Here, management knew of the harassment in that most incidents involved

the Store Manager. Further, according to Acker's signed declaration, Poague complained to upper management on Acker's behalf. (Doc. 138–12 at 8–9.) Acker declares: "I also knew that Michelle Poague had complained about what . . . women at the store, including me, were experiencing in terms of discrimination and sexual harassment. I considered her complaints to be complaints on my behalf as well. I saw that nothing was done in response to her complaints, so I concluded complaining above Swinney would be futile and ineffective." (*Id.*) If Poague complained to upper management on Acker's behalf, a jury could find HWF failed to take "immediate and appropriate" corrective action because, according to Acker, harassment continued after complaints were made. The jury should decide whether Acker wins or loses.

### 2.   Bishop

Bishop started working at HWF in November 2016. (Doc. 49 at ¶ 131.) She left in April 2017. (*Id.* at ¶ 181.) Between November and April, she allegedly experienced the following potentially sex-related or gender-related incidents:

- Swinney once called Bishop his "work wife." (Doc. 126–96 at 17.);

- On a "regular basis," Swinney told Bishop she looked "nice" and "pretty." (Doc. 49–5);

- One time, Swinney fanned money in one hand and threw it at Bishop "like she was a stripper or a whore." (*Id.*);

- One time, Swinney held Bishop's hand without her consent. (*Id.*);

- Once, while alone with Bishop, Swinney grabbed his genitals and readjusted himself. (Doc. 126–96 at 18.) Bishop scolded him. (*Id.*) Swinney replied, "these nuts." (*Id.*) This made Bishop feel "uncomfortable." (*Id.*);

- Swinney "frequently" made jokes with a "deez nuts" punchline. (*Id.* at 18.) For instance, on one occasion Swinney asked Bishop if she liked cheese. She said yes. He encouraged her to eat "deez nuts with cheese" and grabbed his genitals. (*Id.* at 80.);

- Once, at a sales meeting, Bishop saw Swinney dancing provocatively while Washington threw money at him. (Doc. 49–5.);

Some of these incidents (a) involved unwanted sexual harassment (b) based on Bishop's sex. There is nothing to indicate that Bishop wanted or encouraged the harassment. (Doc. 126–96 at 14.) Therefore, Bishop's claim meets elements one, two, and three.

Further, Bishop subjectively believed harassment altered the terms and conditions of her employment. Bishop said she felt "uncomfortable." And, on at least one occasion, Bishop complained to Washington and Vetrano about Swinney "violating" her personal space. (Doc. 126–96 at 22–23.) Viewing all evidence in Bishop's favor, Bishop's testimony coupled with her complaining to management creates a question of fact on element four's subjective prong.

Bishop also submitted enough evidence to survive summary judgment on element four's objective prong. A jury could find the jokes, the crotch grabbing, and the throwing money at Bishop "like she was a stripper or a whore" to be humiliating and find it "unreasonably interfered" with Bishop's job performance.

Finally, Bishop satisfied element five. Because (1) she complained to management and (2) most allegations involve the Store Manager, a jury could find HWF had knowledge of the harassment and failed to take "immediate and appropriate" corrective action.

### 3.   Poague

Viewed in her favor, Poague suffered (at least) the following incidents of sex-related or gender-related harassment:

- Once, while Poague was working, Riggsby approached her and bragged about a female customer "want[ing] to f*** his brains out" and "give him head" on store mattresses. (Doc. 126–13 at 219.) He showed Poague nude pictures the customer sent him. (*Id.*) Poague objected: "I said it was gross, stop." (*Id.* at 222.) Riggsby refused. He continued his vulgar storytelling for over a week. (*Id.* at 220.) Poague told all this to Swinney. (*Id.* at 223.) Swinney "sort of laughed" at Poague's complaint. (*Id.*);

- Gibson suggested Poague performs oral sex. (Doc. 126–35 at 7.);

- When Poague complained about Gibson's behavior, Gibson "cornered her." He warned Poague "he [didn't] want nothing to do" with any sexual harassment claim she might raise. (*Id.* at 7.);

- Poague heard Swinney say "Omaha" at least ten times in three months. (Doc. 125 at 39.) Poague, believing the term objectified women, complained to management. (Doc. 126–13 at 230.) Poague believed "Omaha" showed "men in the store only cared about women as sexual objects." (Doc. 138–13 at ¶ 73.) She called the term "demeaning, humiliating, and offensive." (*Id.*);

- Seavers once "wrote up" Poague. She asked why. Seavers said Poague was "inappropriately . . . involved in woman stuff." (Doc. 126–33 at 2.);

- Seavers told Poague he disapproved of how she looked in maternity clothes. (*Id.*);

- "Every day" Poague worked she heard inappropriate sexual comments about women. (*Id.*);

- Like Bishop, Poague saw Swinney grab his testicles and say "deez nuts" to female employees. (Doc. 126–13 at 234.) This happened more than ten times. (*Id.* at 237.);

- When Poague asked to pump milk, Swinney "stared at her breasts and smiled." The more she showed discomfort and pain, the more he smiled. (Doc. 138–13 at 14.);

- Poague's signed declaration provides: "The more I exhibited the symptoms of discomfort and pain, the wider he would smile. If my milk leaked through my shirt, he would stare at my breasts and smile . . . he took pleasure in my humiliation and pain." (*Id.* at 14.).

A jury could classify these incidents as (1) unwanted harassment (2) based on Poague's sex. She complained to Riggsby, Swinney, and other management. She asked Riggsby to "stop," and she asked Swinney to not use sexist language. Both suggest "unwanted harassment." Further, a reasonable jury could find Poague's sex inspired some of the incidents.

A jury could also find Poague "subjectively perceived the environment to be abusive." *Harris*, 510 U.S. at 21. Again, Poague's deposition testimony is highly relevant. *Hulsey*, 367 F.3d at 1248. In her deposition, Poague called Riggsby's stories "gross." She said she found Swinney's comments sexist and offensive. That testimony, considered alongside her numerous complaints, is sufficient evidence of Poague's subjective objection to the harassment.

Considering *Mendoza*'s four factors, a reasonable employee could find the harassment severe or pervasive enough to alter the terms and conditions of her employment. Poague's claim satisfies factors two and three. Poague says Swinney forced her to work through breast pain and discomfort, with lactation leaking through her shirt. A jury could call this humiliating and severe. Further, a reasonable person could classify Gibson's conduct—"cornering" and "threatening" Poague— as physically threatening. The harassment satisfies element four's objective prong.

Finally, Poague raised a question of fact regarding HWF's liability. Drawing all inferences in her favor, Poague showed HWF "had notice of the alleged harassment and failed to take immediate and appropriate corrective action." *See Watson*, 324 F.3d at 1257.

## B.  Constructive Discharge

Constructive discharge occurs when an employer "deliberately makes an employee's working conditions intolerable and thereby forces [her] to quit [her] job." *See Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) (quoting *Munday v. Waste Mgmt. of N. Am.*, 126 F.3d 752, 754 (11th Cir. 1996)). Courts ask if the work environment is "so unbearable that a reasonable person . . . would be compelled to resign." *Virgo v. Riviera Beach Assoc., Ltd.*, 30 F.3d 1350,1363 (11th Cir. 1994). A plaintiff's subjective feelings are irrelevant. *See Hipp v. Liberty Nat'l Life Ins. Co.*,

252 F.3d 1208, 1231 (11th Cir. 2001) ("In evaluating constructive discharge claims, we do not consider the plaintiff's subjective feelings.").

The standard for constructive discharge is "quite high." *Id.* It's even higher than the hostile-work-environment standard. *See Penn. State Police v. Suders*, 542 U.S. 129, 134 (2004). Along with showing harassment altered the terms and conditions of her employment, a claimant must show "a causal link between the allegedly intolerable conditions and her resignation." *Green v. Brennan*, 136 S. Ct. 1769, 1781 (2016). Further, a claimant must give her employer enough time to remedy the situation before resigning. *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996) ("A constructive discharge claim will generally not be found if the employer is not given sufficient time to remedy the situation.").

Plaintiffs' constructive-discharge claims satisfy element one: they submitted evidence that harassment subjectively and objectively altered the terms and conditions of their employment. A jury could find that the harassment—described above—was so "unbearable that a reasonable person . . . would be compelled to resign."

Further, evidence suggests a "causal link" between the harassment and the Plaintiffs' resignations. According to Acker, Swinney's abuse left her with "no

choice but to leave."[2] (Doc. 138–12 at ¶ 20) ("[T]he abuse of my work environment effectively terminated my employment because Huntsville Wholesale Furniture did nothing to stop the harassment I was experiencing. My only choices were remain and continue to be abused, or leave to escape the abuse."). Poague's resignation letter called HWF's environment "dehumanizing" and "abusive." (Doc. 126–67.) And, in a letter to management, Bishop says she "was forced to quit [her] job" because the harassment embarrassed and scared her. (Doc. 121–15 at 2.) This evidence suggests HWF's hostile-work-environment was causally linked to Acker, Poague, and Bishop resigning.

Finally, a jury could find HWF had "sufficient time" to stop the harassment. Plaintiffs alleged scores of incidents, and evidence suggests HWF had (actual or constructive) knowledge but did not act promptly. Therefore, Plaintiffs' constructive-discharge claims will be presented to a jury.

### C.   Pregnancy Discrimination

Poague also sued for pregnancy discrimination. Defendants moved for summary judgment. The Court denies Defendants' motion.

---

[2] Some evidence suggests sales issues (and not sex harassment) inspired Acker's resignation. Acker described her last day: "I was working on a sale, and Taylor would not make himself available to help me in any way. I said, if I can't make money, then there's no point in me being here, and then I left." (Doc. 126–75 at 65.) But because a reasonable jury could find harassment motivated Acker's resignation, a factual dispute arises. Summary judgment is not appropriate.

Title VII prohibits employers from discriminating "against any individual . . . because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). The Pregnancy Discrimination Act (PDA) explained:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . .

42 U.S.C. § 2000e(k).

Courts review pregnancy-discrimination claims with "the same . . . analysis used in other Title VII sex discrimination suits." *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1313 (11th Cir. 1994). A claimant must show her employer intended to discriminate against her. *Id.* at 1313. She can use direct or circumstantial evidence. *Id.* If a claimant relies on circumstantial evidence, she ordinarily must satisfy the *McDonnell Douglas* burden-shifting framework. *See Young v. UPS, Inc.*, 135 S. Ct. 1338, 1345 (2015).

Under *McDonnell Douglas*, a claimant first states a prima facie case. *Id.* at 1353. For that, she must show (a) she belongs to the protected class, (b) she sought accommodation, (c) her employer did not accommodate her, and (d) her employer accommodated others who were similar to her in "their ability or inability to work." *Id.* at 1354. A claimant satisfies element (d) through evidence her employer accommodated other employees who, like the claimant, could not "do the job." *See*

*Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1228 n.14 (11th Cir. 2019) (en banc) (explaining how "the comparator analysis under the PDA focuses on a single criterion—one's ability to do the job"); *see also Young*, 135 S. Ct. at 1355 ("[W]hy, when the employer accommodated so many, could it not accommodate pregnant women as well?").

Poague meets the first three elements. As a breastfeeding mother, she belonged to § 2000e-2(a)(1)'s protected class. *Hicks v. City of Tuscaloosa*, 870 F.3d 1253, 1260 (11th Cir. 2017). Poague requested accommodation. She needed time, each day, to travel home and pump breastmilk.[3] To accommodate her travel and pumping time, Poague requested part-time hours with part-time sales requirements. (Doc. 126–36 at 3.) Nothing suggests HWF provided that accommodation. Instead, HWF offered Poague an ultimatum: meet full-time sales requirements while working part-time hours or go on a performance-improvement plan. (Doc. 126–13 at 167.) That ultimatum refused Poague the accommodation she sought. Poague satisfied the first three elements of a prima facie case. *Cf. Texas Dept. of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981) ("The burden of establishing a prima facie case of disparate treatment is not onerous.").

---

[3] As later sections explain, Poague didn't believe HWF offered a clean, private on-site place to pump. With nowhere to pump on-site, she needed accommodation: time to travel to a clean, private place.

As to element four, HWF accommodated employees similar to Poague in their inability to work. According to Poague's deposition, HWF reduced the hours of at least three other Product Specialists—all three so that they could attend school. (Doc. 126–13 at 60–65.) Some of these student-employees never met full-time sales requirements. (Doc. 143 at 87–88.) However, HWF never placed these employees on improvement plans. (*Id.*) Taking Poague's testimony as true, HWF accommodated three non-pregnant employees who, like Poague, could not work full-time hours or hit full-time sales goals. To paraphrase *Young*: Why, when HWF accommodated so many students, could it not accommodate pregnant women as well? Poague has met the fourth element of a prima facie case.[4]

Because Poague stated a prima facie case, the burden shifts to HWF. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). HWF must "articulate some legitimate, nondiscriminatory reason" for not accommodating Poague. *Id.* This burden is one of production, not persuasion. *Perryman v. Johnson*

---

[4] A recent Eleventh Circuit opinion supports this conclusion. *See Durham v. Rural/Metro Corp.*, 955 F.3d 1279 (11th Cir. 2020). In *Durham*, a pregnant EMT's physician advised her to not lift more than fifty pounds. *Id.* at 1281. This lifting restriction disqualified Durham from EMT work. *Id.* Durham's supervisor refused to assign her to a light-duty position. *Id.* at 1283. However, the employer accommodated at least four non-pregnant employees who, like Durham, could not lift the required one-hundred pounds. *Id.* The Court said that accommodating some non-pregnant employees with lifting restrictions but not accommodating pregnant employees with lifting restrictions was evidence for element four of a prima facie case. Like in *Durham*, Poague's inability to work full-time hours and her student-colleagues' inability to work full-time hours render them equally unable to perform the hour and sales duties of a full-time Product Specialist.

*Prods. Co. Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983) (calling an employer's burden "exceedingly light").

HWF did not meet its burden of production. Defendants' brief explains how HWF accommodated Poague. (Doc. 125 at 93) ("Taylor Swinney even permitted Poague to bring her baby to work."). The question, however, is why HWF did not allow the accommodation Poague requested. Defendants' briefs are silent on that front.[5] Having produced no evidence of a "legitimate, non-discriminatory" reason for denying Poague's accommodation, Defendants' motion for summary judgment fails.

Even if HWF met its burden, Poague wins under the third *McDonnell Douglas* prong. *See Young*, 135 S. Ct. at 1354. *Young* discussed multiple ways a pregnancy-discrimination claimant might show pretext. *Id.* at 1354. One way is for the claimant to show her employer has policies for accommodating nonpregnant workers "to the point that a jury could find that its reasons for failing to accommodate pregnant employees give rise to an inference of intentional discrimination." *Id.* at 1354–55.

A jury could find HWF's (unexplained) reasons for failing to accommodate Poague "give rise to an inference of intentional discrimination." Like in *Young*—

---

[5] Rather than explain why it did not adjust Poague's hours and sales, HWF argued Poague didn't meet sales goals, didn't state a prima facie case, and that Poague made the "personal decision not to work full time." (Doc. 153 at 42–44.) All this bears little relevance for step two of *McDonnell Douglas*—a specific inquiry into whether HWF "produced" a legitimate reason to not allow Poague to work part-time hours with part-time quotas.

where UPS accommodated non-pregnant workers' lifting restrictions—HWF accommodates non-pregnant student-workers' time (and sales) restrictions. Accommodating student workers but not accommodating breastfeeding workers suggests pretext. *Id.*

### D.   Disparate Treatment

Poague, Acker, and Bishop also sued HWF for disparate treatment. Poague and Acker's claims survive summary judgment. Bishop's claim fails.

#### 1.   Poague and Acker

Successful disparate treatment claims prove the employer acted with discriminatory intent. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005). Claimants prove discriminatory intent through direct or circumstantial evidence. *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006). Claimants relying on circumstantial evidence use the *McDonnell Douglas* burden-shifting framework. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).

Under *McDonnell Douglas*, plaintiffs first state a prima facie case. *McDonnell Douglas*, 411 U.S. at 802. A prima facie case has four elements. First, the plaintiff shows she belongs to a protected class. *Burke-Fowler*, 447 F.3d at 1323. Defendants do not contest this element. Second, she must show her employer subjected her to an adverse employment action. *Id.* An adverse employment action "alters the

employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Van Voorhis v. Hillsborough Cnty. Bd. of Cnty. Com'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008). Lost compensation can be an adverse employment action. *Gupta*, 212 F.3d at 590.

Acker and Poague meet element two. Acker and Poague claim Swinney rejected sales for female Product Specialists and approved identical sales for male Product Specialists. (Doc. 126–75 at 18–21.) They also claim HWF management ignored the "Up System"—a tool to randomly assign customers to salespersons—and gave female Product Specialists' customers to male Product Specialists. (*Id.* at 44.) For instance, Acker says Swinney took customers from her and gave them to Gibson—a male Product Specialist—even though she was next in the "Up" rotation. (*Id.*)

Third, the plaintiff must show her employer treated "similarly situated employees outside her class more favorably" than it treated her. *Burke-Fowler*, 447 F.3d at 1323. To be "similarly situated," a plaintiff and her proffered comparator must be similar in "all material respects." *Lewis*, 918 F.3d at 1218. Ordinarily, a similarly-situated comparator engages in the "same basic conduct as the plaintiff." *Id.* (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992)). Further, a similarly-situated comparator is "ordinarily . . . under the jurisdiction of the same

supervisor" and is "subject to the same employment policy, guideline, or rule as the plaintiff." *Id.*

Gibson is a similarly-situated employee, and evidence suggests HWF treated him more favorably than it treated Acker and Poague. As a Product Specialist, he engaged in the "same basic conduct" as Acker and Poague. (Doc. 126–30 at 15–18.) He sold furniture. He had the same supervisor (Swinney). And, as a Product Specialist, he was "subject to the same employment policies" and guidelines, including the "Up System," as Plaintiffs. Evidence suggests HWF management treated Gibson "more favorably" than Acker and Poague: it gave Gibson more customers and more sales. Acker and Poague met their burden as to the third element.

Fourth, the plaintiffs must show they were "qualified to do [their] job[s]." *Burke-Fowler*, 477 F.3d at 1323. Defendants' do not challenge this fourth and final element.

Because Acker and Poague stated a prima facie disparate-treatment case, the burden shifts to HWF. *McDonnell Douglas*, 411 U.S. at 802. HWF must show a legitimate reason for the adverse employment actions they suffered. *See Burke-Fowler*, 447 F.3d at 1323. HWF's "explanation of its legitimate reason(s) must be clear and reasonably specific." *See Texas Dept. of Cmty. Affs. v. Burdine*, 450 U.S. 248, 258 (1981). To be "reasonably specific," the explanation must give Plaintiffs

"a full and fair opportunity to demonstrate pretext." *See Chapman v. Al Transp.*, 229

F.3d 1012, 1034 (11th Cir. 2000) (quoting *Burdine*, 450 U.S. at 258)).

HWF failed to meet its burden. HWF's summary-judgment brief "explains"

its legitimate reasons with two sentences:

> Since the plaintiffs have not identified any adverse job action, HWF
> cannot respond at this time. However, all of HWF's actions were taken
> for legitimate, non-discriminatory business reasons.

(Doc. 125 at 90.) These sentences are not "reasonably specific." They do not allow

Plaintiffs "a full and fair opportunity" to show pretext.

In a reply brief, HWF offers more explanation for the first adverse

employment action (disparate treatment in sale approval). "Gibson, who was a

talented salesperson and generally had very high margins, could occasionally make

a low margins sale and remain within his targets." (Doc. 153 at 27.) Stated

differently, Gibson sold more than Plaintiffs. Therefore, his sales and success, not

his gender, justifies HWF approving Gibson's low-margin sales—sales it would not

approve for Plaintiffs.

However, HWF's reply brief never explains the second adverse employment

action (deviation from the Up System). Why did HWF take sales from female

Product Specialists? Rather than suggest a legitimate reason, Defendants argue that

no deviations happened. (Doc. 125 at 89) ("The plaintiffs cannot identify a single

transaction which was taken away from any one of them and given to someone else

for any discriminatory reason."); (*Id.*) ("Poague, and Acker cannot point to a single instance where a male employee was treated more favorably in any tangible way."); (Doc. 153 at 30) ("The Plaintiffs have not demonstrated . . . that the alleged loss of any specific sales opportunity actually benefited a male employee."). These arguments challenge the credibility of Plaintiffs' testimony. *But see Anderson*, 477 U.S. at 249 (at summary judgment, the trial judge does not weigh evidence). But HWF offered no legitimate, non-discriminatory reason for Up-System deviation. With no explanation, Plaintiffs have no "full and fair opportunity to demonstrate pretext." Therefore, under *Chapman* and *Burdine*, Acker and Poague's disparate-treatment claims survive summary judgment. *See Chapman*, 229 F.3d at 1034.

## 2.    Bishop

Defendants moved for summary judgment on Bishop's disparate-treatment claim (Doc. 125 at 90), but Bishop never responded (*See* Doc. 143 at 66–70). Plaintiffs' disparate-treatment briefing never mentions Bishop or explains the bases of Bishop's claim. (*Id.*) Having not responded, Bishop's disparate-treatment claim is deemed abandoned, and summary judgment is due to be granted. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *see also Clark v. City of Atlanta, Ga.*, 544 F. App'x 848, 855 (11th Cir. 2013) ("[I]n

failing to respond to the defendants' arguments, Mr. and Ms. Clark abandoned their excessive force and state law claims.").

### E.   Retaliation

Title VII's antiretaliation section prohibits employers from "discriminat[ing] against" an employee because the employee "has opposed" unlawful employment practices or "has made a charge, testified, assisted, or participated" in a Title VII hearing, proceeding, or investigation. 42 U.S.C. § 2000e-3(a). Poague, Acker, and Bishop say HWF retaliated against them for complaining, formally and informally, about Swinney's behavior.

The Plaintiffs offered no direct evidence of retaliation, so the Court again turns to *McDonnell Douglas* and its burden shifting. *See Brown v. Ala. Dept. of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010). First, Plaintiffs must state a prima facie case. A prima facie case for retaliation has three elements: (1) the employee engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) a causal link exists between the protected activity and the adverse employment action. *Fucron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016). The burden then shifts to HWF to "produce a legitimate, non-discriminatory reason for the challenged employment action." *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001). If HWF "produces" that lawful reason, the burden shifts

yet again. *Id.* Plaintiffs would then have "the ultimate burden of proving [HWF's] reason to be a pretext for unlawful discrimination." *Id.*

### 1.   Poague

Poague alleges two sorts of "statutorily protected conduct." On December 8, 2016, she filed an EEOC charge. (Doc. 49–1.) Title VII's "participation clause" protects that conduct. *See Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1352–53 (11th Cir. 1999). Second, Poague alleges the following complaints to HWF management: (1) on November 3, 2016, she complained to Nancy Malone, HWF's Executive Administrator, about HWF's hostile work environment (Doc. 126–36); (2) on December 31, 2016, she complained to Swinney about disparate treatment in sale approval; (3) when she resigned, she complained about "discrimination, harassment, and retaliation" (Doc. 126–67). Title VII's "opposition clause" protects all three complaints. *See Fucron*, 843 F.3d at 1312 (Title VII protections "extend to those who voice informal complaints").

Poague must next show she suffered an adverse employment action. *Fucron*, 843 F.3d at 1181. An adverse employment action is one that "well might have dissuaded a reasonable worker from" engaging in the "statutorily protected conduct." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

Poague submitted evidence of at least three adverse employment actions. First, nine days after she filed her EEOC charge and six weeks after she complained

to Malone, Poague did not get her bonus check. (Doc. 126–35 at 7.) Even if HWF later paid Poague's bonus, retroactive payment would not "alter the fact that she had been denied the increase or erase all injury associated with it, specifically the lost value and use of the funds." *See Crawford v. Carroll*, 529 F.3d 961, 972 (11th Cir. 2008). Second, Swinney told an employee he planned to "get rid of" Poague.[6] (Doc. 49–1 at 4.) Threatened termination might well "dissuade a reasonable person" from complaining. Third, on December 27—nineteen days after Poague's EEOC charge—management falsely listed Poague's delivered sales as "undelivered." (Doc. 49–1 at 5.) This cost Poague commission. (*Id.*) Poague thinks Swinney purposely "manipulate[ed] the system" to "get [her] to quit." (*Id.*) If true, this was an adverse employment action. *Cf. Gillis v. Ga. Dept. of Corr.*, 400 F.3d 883, 887 (11th Cir. 2005) (explaining how "actions that affect compensation are considered adverse employment actions").

A reasonable juror could find that the adverse actions were casually linked to her protected activity. To show causation, a plaintiff need only prove "the protected activity and the adverse action are not completely unrelated." *Cotton v. Cracker Barrell Old Country Store, Inc.*, 434 F.3d 1227, 1233 (2006) (quoting *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998)). Close temporal

---

[6] The briefs do not say when Swinney threatened this. According to Poague it happened sometime after she filed her EEOC charge—sometime after December 8, 2016. (Doc. 49–1 at 3.)

proximity between conduct and action suggests causation. *Id.* at 1232. Here, all three actions happened within two months of Poague complaining to Malone and within three weeks of Poague's EEOC charge. This suggests Poague's conduct and Swinney's responses were "not completely unrelated." *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (seven weeks between complaint and adverse action "sufficiently proximate to create a causal nexus"). Poague stated a prima facie retaliation case.

Defendants did not offer a legitimate, non-discriminatory reason for the adverse employment actions. Their summary-judgment brief challenges Poague's retaliation claim with only one line: "There is simply no evidence that HWF retaliated against any of the plaintiffs in this case at any time." (Doc. 125 at 91.) It disputes Poague's evidence. *But see Anderson*, 477 U.S. at 249 (explaining how, at summary judgment, "the judge's function is not himself to weigh the evidence"). However, to satisfy their burden, Defendants must explain *why* the actions happened—why Poague didn't get her bonus, why Swinney threatened to fire Poague. Without those explanations, Poague had no "full and fair opportunity to demonstrate pretext." *See Chapman*, 299 F.3d at 1034. Poague's retaliation claim survives summary judgment.

### 2. Bishop

Bishop engaged in statutorily protected conduct. First she went to Washington. (Doc. 126–96 at 24.) She told Washington she "felt uncomfortable" about Swinney holding her hand and calling her his "work wife." (*Id.*) Washington told Bishop to speak with Vetrano. (*Id.*) Bishop complied. (*Id.*) She told Vetrano about Swinney "standing too close" and making her feel "uncomfortable." Even though, when complaining, Bishop never used the words "discrimination" or "sexual harassment," Title VII's opposition clause protects those who voice informal complaints "explicitly or *implicitly*." *Fucron*, 843 F.3d at 1311 (emphasis added). Taken together, Bishop's two complaints imply sexual harassment: Swinney held my hand, he called me his "work wife," he stands too close, and I'm uncomfortable. Sexual harassment is implicit.

After complaining, Bishop suffered adverse employment action. HWF cut Bishop's hours in half. (Doc. 126–96 at 12.) Halved hours and halved income "well might dissuade" someone from complaining. *Bass v. Bd. of Comm'rs, Orange Cnty., Fla.*, 256 F.3d 1095, 1118 (11th Cir. 2001) (depriving someone of compensation he "otherwise would have earned" is an adverse employment action).

Temporal proximity suggests Bishop's complaint caused her reduced hours. Bishop says she complained to Vetrano and Washington in March 2017. HWF cut her hours in early April 2017. (Doc. 126–96 at 148–49.); (*Id.* at 12.) This suggests

the complaint and reduced hours were not "completely unrelated." *See Farley*, 197 F.3d at 1337; *cf. Burdine*, 450 U.S. at 254 ("The burden of establishing a prima facie case . . . is not onerous.").

Once again, HWF did not rebut Bishop's prima facie case. Because HWF never explained why it cut Bishop's hours, Bishop had no chance to show pretext. Therefore, her retaliation claim will proceed to trial.

### 3. Acker

Acker asserts that she engaged in "statutorily protected conduct" on three occasions. First, she complained to the EEOC. (Doc. 143 at 70.) Second, she filed this lawsuit. (*Id.*) Third, Acker says Poague's resignation letter "included" Acker's name. (*Id.* at 71.) Acker says this placed her in "the zone of interest" of Poague's protected conduct.[7]

Even if Acker engaged in protected conduct, she suffered no adverse employment action. She alleges two adverse actions. First, HWF and Swinney filed counterclaims when Acker sued them. (*Id.* at 79.) Second, on January 27, 2017, "Swinney chastised Acker for accepting Poague's help" on a sale. (*Id.*) Neither the counterclaim nor the "chastisement" were adverse employment actions.

---

[7] In other words, Poague's conduct became Acker's conduct because Poague mentioned Acker. For support, Acker points to *Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011). *Thompson*, however, left open whether "trusted co-workers" fall within the "zone of interest" of another employee's complaint. *Thompson*, 562 U.S. at 174. It's unclear, and unnecessary to decide, whether Acker engaged in "protected conduct" when Poague complained on Acker's behalf.

A lawsuit or counterclaim against an employee is an adverse employment action only when it lacks a reasonable basis in fact or law. *Smith v. Miami-Dade Cnty.*, 621 F. App'x 955, 960 (11th Cir. 2015); *Darveau v. Detecon, Inc., Inc.*, 515 F.3d 334, 341 (4th Cir. 2008) (citing *Bill Johnson's Rests. v. NLRB*, 461 U.S. 731, 744 (1983)). In *Miami-Dade County*, an employee (Smith) and her employer executed a settlement agreement. *Id.* at 957. The agreement waived Smith's employment-related claims. *Id.* at 961. After the waiver, Smith sued her employer under the Americans with Disabilities Act and Fair Credit Reporting Act. *Id.* at 957. Her employer counterclaimed for breach of contract. *Id.* Smith believed the counterclaim was unlawful retaliation. The Eleventh Circuit disagreed. *Id.* at 960. The settlement agreement potentially barred Smith's claims. Therefore, the employer's breach-of-contract counterclaim had a "reasonable basis in law" and could not constitute unlawful retaliation. *Id.*

HWF and Swinney's counterclaims were not adverse employment actions. As Part IV explains, Acker signed a settlement agreement. (Doc. 126–89.) The agreement potentially waived Acker's employment-law claims. (*Id.*) Then, after signing, Acker sued HWF and Swinney. (*See* Doc. 49) Her suit raised the Title VII claims she potentially waived. (*Id.*) Therefore, like in *Miami-Dade County*, HWF's and Swinney's counterclaims had a reasonable basis in fact and law. Those reasonable counterclaims were not unlawful retaliation.

Similarly, Swinney "chastising" Acker on one occasion would not dissuade a reasonable person from engaging in protected conduct. *See King v. Louisiana*, 294 F. App'x 77, 85 (5th Cir. 2008) (a verbal reprimand is not an adverse employment action). Nothing suggests Swinney's chastisement came with formal consequences. Nothing suggests Swinney added the reprimand to Acker's personnel file. One scolding, with no accompanying consequences, is not an adverse employment action. *See Davis v. Town of Lake Park*, 245 F.3d 1232, 1235–40 (11th Cir. 2001); *see also*, *Medearis v. CVS Pharm., Inc.*, 646 F. App'x 891, 898 (11th Cir. 2016) (post-*Burlington*, "several written reprimands . . . not even made part of [the employee's] personnel file" and unaccompanied by other consequences still did not constitute an adverse employment action).

Acker did not suffer an adverse employment action. Having shown no retaliatory adverse action, Acker failed to state a prima facie retaliation case. Therefore, her claim fails as a matter of law.

### F.   Family and Medical Leave Act (FMLA): Interference and Retaliation

The FMLA creates two causes of action: (1) interference claims and (2) retaliation claims. *Strickland v. Water Works and Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001). Poague sued under both theories. Both her claims survive summary judgment.

### 1. Interference

No employer may "interfere with, restrain, or deny the exercise of or the attempt to exercise" an FMLA right. 29 U.S.C. § 2615. Interference claims have three elements. *See Evans v. Books-A-Million*, 762 F.3d 1288 (11th Cir. 2014).

First, the employee must be entitled to FMLA benefits. *Id.* at 1295.The FMLA entitles an employee to leave if (a) her child has a "serious health condition" and (b) she needs to care for her child. 29 U.S.C. § 2612. Any physical condition "that involves continuing treatment by a health care provider" is a serious health condition. 29 U.S.C. § 2611(11).

Poague meets this first element. In the spring of 2016, Poague's son was not growing at a normal pace. In July, she took her son to Dr. Kelton, a pediatrician. (Doc. 126–46 at 29–32.) Dr. Kelton called Poague's son "underweight." (*Id.* at 30.) He believed Poague's son would not eat at daycare and would only nurse. (*Id.*) According to Dr. Kelton, this was a "chronic condition" requiring "periodic visits for treatment." (*Id.* at 31.) In other words, a serious health condition. He recommended Poague stay home for twelve weeks. (*Id.* at 30.) There, she could nurse her son and return him to a healthy weight. (*Id.*) The FMLA entitled her to these benefits.

Second, the employer must deny the employee benefits to which she is entitled. *Martin v. Brevard Cnty. Pub. Schs.*, 543 F.3d 1261, 1266–67 (11th Cir.

2008). The employee must request benefits before her employer can deny them. *See Cruz v. Publix Super Mkts.*, 428 F.3d 1379, 1383 (11th Cir. 2005). She need not say "FMLA," she need only "adequately convey[] to the employer sufficient information to put the employer on notice that her [need] was potentially FMLA-qualifying." *Gay v. Gilman Paper Co.*, 125 F.3d 1432, 1436 (11th Cir. 1997). If the need for leave is foreseeable, the employee "must provide the employer at least 30 days advanced notice." 29 C.F.R. § 825.302(a) (2020). Expected births and planned medical treatment are examples of foreseeable needs. *Id.* If the need is unforeseeable, the 30-day notice requirement does not apply. 29 C.F.R. § 825.303(a) (2020).

Poague satisfies element two. In June 2016, seeing her son's slow growth, Poague approached Swinney. (Doc. 126–13 at 48.) She told him her son was "not gaining weight like he should," that she was "worried about it," and she wanted to take leave. (*Id.*) This adequately conveyed to HWF that Poague had a "potentially FMLA-qualifying" need. Her son's condition was not foreseeable. Unlike births and planned treatments, a baby's chronic inability to gain weight is neither expected nor scheduled. Therefore, the FMLA 30-day notice requirement did not apply. Swinney relayed Poague's request to Seavers who denied her request. (*Id.*) A jury could find (a) Poague reasonably requested leave and (b) HWF, through Swinney and Seavers, denied her request.

Third, the employee must show the denial of benefits prejudiced her. *Evans*, 762 F.3d at 1295 (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)). An employee is prejudiced if she suffered "some harm remediable by either damages or equitable relief." *Id.* at 1296 (quoting *Anderson v. Discovery Commc'ns, LLC.*, 517 F. App'x 190, 198 (4th Cir. 2013)).

A jury could find HWF prejudiced Poague when it denied her leave. For weeks she worked with a "chronically" ill child at home. A jury could classify this as a harm remediable by damages. Because Poague submitted sufficient evidence for all elements, summary judgment as to this claim is due to be denied.

## 2.   Retaliation

HWF eventually allowed Poague to take leave. (Doc. 126–13 at 50–51.) When she returned, Poague says HWF management retaliated.

Employers may not retaliate against employees for taking FMLA leave. 29 U.S.C. § 2615(a)(2) ("It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."). Successful retaliation claims, unlike interference claims, must show an employer acted with "impermissible retaliatory or discriminatory animus." *Strickland*, 239 F.3d 1199, 1207 (11th Cir. 2001) (quoting *King v. Preferred Tech. Group*, 166 F.3d 877, 891 (7th Cir. 1999)).

If, like here, a claimant offers only circumstantial evidence of retaliatory or discriminatory intent, courts apply the *McDonnell Douglas* framework. *Martin*, 543 F.3d at 1268. The claimant must show (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) the action "was casually related to the protected activity." *Id.* (citing *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000)). If she shows all three, the burden shifts to her employer. *Id.* Her employer then must give a "legitimate reason for the adverse action." *Id.* (quoting *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006)). If met, the burden then again shifts to the employee who must present enough evidence "for a reasonable fact finder to conclude that the reasons given by the employer" were pretextual. *Id.*

Poague engaged in protected activity when she took FMLA leave and then, according to Poague, the following happened within one month of her return to work:

- HWF placed her on a Performance Improvement Plan;

- Managers "flat out ignored" her when she needed help;

- Managers wrongfully "split" Poague's sales with other Product Specialists, costing Poague commission. She alleges this happened twice in October 2016;

- Managers wrote up Poague for poor sales "each week" in October 2016. Three of those weeks "not a single other sales associate in [her] store" met sales goals. According to Poague, HWF did not write up or discipline the other underperforming Product Specialists; and

- Managers rejected Poague's sales but approved other Product Specialist's sales at the same profit margin.

(Doc. 126–36 at 3–4.)

At least some of these occurrences constitute adverse employment actions, and the temporal proximity suggests her FMLA leave was casually connected to these adverse actions. Poague returned from leave on October 1, 2016. Both the sales "splits" and rejections happened between October 1 and November 3, 2016. (Doc. 126–36.) Because HWF took adverse action within four weeks of Poague's protected conduct, Poague satisfied her causation (and prima facie) burden. *See Farley*, 197 F.3d at 1338. Thus, the burden shifts to HWF.

Defendants offered no legitimate, non-discriminatory reason for splitting two of Poague's sales in October 2016. In a separate section of their reply brief, Defendants offered a legitimate reason for splitting *one* of Poague's sales.[8] But it's unclear whether the explained "split" is one that happened in October 2016. And, even if HWF explained one of the two allegedly-wrongful splits, both were adverse job actions. Because HWF did not explain why management split two of Poague's sales the month after she returned from FMLA leave, Poague had no "full and fair

---

[8] According to HWF, Swinney once split one of Poague's sales with Riggsby because Riggsby helped Poague with the transaction. (Doc. 153 at 28.)

opportunity" to show pretext. *See Chapman*, 229 F.3d at 1034. Her FMLA retaliation claim is due to survive summary judgment.

### G.    Fair Labor Standards Act

Plaintiffs sue under the Fair Labor Standard Act (FLSA), 29 U.S.C. § 206(a), minimum-wage provision.[9] Their claims have two bases. First, an advertising scheme. Seavers believed "guerilla marketing" would churn up business and help HWF "reach out to [its] community." (Doc. 126–44.) Therefore, HWF required Product Specialists to, on occasion, take promotional flyers to local businesses. (*Id.*) Acker says Product Specialists passed out flyers once a month.[10] (Doc. 126–76 at 318.) This usually lasted an hour. (*Id.*) Acker said it twice lasted "over two hours." (*Id.*) According to Acker and Poague, HWF never allowed Product Specialists to clock in before passing out flyers.[11] (*Id.*; Doc. 138–13 at ¶ 40.) Second, Acker claims she once "came in on [her] day off to finish a sale, and James Riggsby told [her she] could not clock in to complete it." (Doc. 126–76 at 317.)

Plaintiffs argue any unpaid hourly work violates the FLSA, even if the employee averages more than $7.25 per hour per pay period. (Doc. 143 at 99.) Most

---

[9] Plaintiffs do not claim HWF underpaid them for overtime. (*See* Doc. 143 at 100) ("The Plaintiffs do not allege an overtime violation.").

[10] HWF disagrees. According to Seavers, the "entire length of the Program lasted about one month . . . and [then] was discontinued companywide." (Doc. 126–44.)

[11] HWF disagrees. Seavers says "[t]he Product Specialists were told not to work off the clock." (Doc. 126–44 at ¶ 8.)

courts disagree with the idea that <u>any</u> unpaid time is an automatic minimum-wage violation. *See e.g.*, *Douglas v. Xerox Bus. Servs., LLC*, 875 F.3d 884 (9th Cir. 2017) (reviewing cases). Rather than look at each hour in isolation, most courts follow the "weekly-measuring-rod approach." *See U.S. v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487 (2d Cir. 1960) ("[T]he Congressional purpose [behind the FLSA] is met so long as the total weekly wage paid by an employer meets the minimum weekly requirements of the statute . . . ."). This approach multiplies hours worked (in a single pay period) by $7.25. If the employee earned more than that product, he earned more than the minimum wage. *Id.* at 490. For instance, if Employee Y earns zero dollars for two hours and $100 for 38 hours, he averaged well over $7.25. Therefore, under the weekly-averaging method, Employee Y's employer did not violate FLSA's minimum-wage provision.

To the Court's knowledge, the Eleventh Circuit has not decided this issue. For two reasons, the Court believes the Eleventh Circuit will adopt the weekly-averaging or weekly-measuring-rod method. First, at least six circuits average hourly pay. *Douglas*, 875 F.3d 884 ("[W]e think the proper course is to join our sister circuits, which have adopted the per-workweek measure . . . ."); *U.S. Dept. of Lab. v. Cole Enter., Inc.*, 62 F.3d 775, 780 (6th Cir. 1995); *Hensley v. MacMillian Bloedel Containers, Inc.*, 786 F.2d 353, 357 (8th Cir. 1986); *Dove v. Coupe*, 759 F.2d 167, 171–72 (D.C. Cir. 1985); *Blankenship v. Thurston Motor Lines, Inc.*, 415 F.2d 1193,

1198 (4th Cir. 1969); *Klinghoffer*, 285 F.2d at 490. The Court is not aware of a disagreeing circuit. Second, district courts in the Eleventh Circuit routinely apply the weekly-averaging method. *See e.g., Calderone v. Scott*, No. 2:14-519-FtM-PAM-CM, 2017 WL 5444190, at *3 (M.D. Fla. Feb. 27, 2017); *Betancourt v. Gen. Servs. of Va., Inc.*, No. 8:14-cv-1219-T-17MAP, 2015 WL 6446071, at *7 (M.D. Fla. Oct. 23, 2015) ("An employer satisfies its minimum wage obligation by paying, for a workweek, an amount that exceeds the product of the number of hours worked times the applicable minimum wage.").

Applying the weekly-averaging method, the Court cannot draw a "just and reasonable inference" that HWF violated FLSA's minimum-wage provision. *See Donovan v. New Floridian Hotel*, 676 F.2d 468 (11th Cir. 1982). Accepting Acker's testimony, one week every month Product Specialists worked without pay for one-to-two hours. Assume two hours. Product Specialists earn $10 per hour plus commission. (Doc. 126–75 at 16.) A Product Specialist working 40 hours, therefore, earns a weekly base pay of $400, or $110 more than the federal minimum wage.[12] Without more than Acker's testimony and Poague's Declaration, the Court cannot "reasonably infer" two unworked hours lowered Plaintiffs' weekly average below $7.25. Two unworked hours—$20 of lost wages—cannot bridge the $110 divide

---

[12] 7.25 x 40 = 290. 400 – 290 = 110.

between what a Product Specialist earns and what the FLSA requires. Summary judgment is due to be granted on Plaintiffs' minimum-wage claims.

Poague also sued HWF for violating Section 7 of the FLSA, codified at 29 U.S.C. § 207. Section 207 says "each time" an employee has need, her employer shall allow "reasonable break time for [her] to express breast milk . . . for 1 year after the child's birth." 29 U.S.C. § 207(r)(1). Employers must provide breastfeeding mothers "a place [to express milk], other than a bathroom, that is shielded from view *and* free from intrusion from coworkers and the public." *Id.* (emphasis added).

Poague's deposition testimony creates two issues of material fact. First, whether HWF provided her a place "shielded from view" "each time" she needed to pump. Sometimes Swinney allowed Poague to use the manager's office. (Doc. 126–13 at 33.) Other times, Swinney offered Poague only the Community Room. The Community Room had cameras. (*Id.* at 34.) Poague says IT employees could watch her as she pumped. (Doc. 138–13 at ¶ 54.) If true, a reasonable juror could find the Community Room was not "shielded from view." Further, Poague testified customers shop the Community Room for clearance items. (Doc. 126–13 at 34.) If HWF only offered a heavily-shopped area, HWF did not provide Poague a place "free from intrusion from . . . the public." Summary judgment is due to be denied as to Poague's § 207(r)(1) claim.

### H.  Tort Claims

Acker and Bishop sued Swinney for assault and battery. They, along with Poague, sued Swinney for outrage. All three argue HWF is *vicariously* liable for Swinney's assaultive and outrageous behavior. All three argue HWF is *directly* liable for negligently and/or wantonly hiring Swinney. The Court first addresses Swinney's liability to Acker, Bishop, and Poague. Then, the Court discusses HWF's responsibility for Swinney's behavior. Finally, the Court turns to HWF's direct liability.

### 1.  Assault and Battery

Assault-and-battery claims[13] have three elements: (1) the defendant touched the plaintiff, (2) the defendant intended the touching, and (3) the touching "was conducted in a harmful or offensive manner." *Harper*, 892 So. 2d at 353. To separate harmful or offensive touching from unwanted (but unactionable) touching, courts look to "the manner and spirit in which it is done." *Singer Sewing Mach. Co. v. Methvin*, 63 So. 997, 1000 (Ala. 1913) ("And to push gently against one, in the

---

[13] Assault and battery are separate torts. *See Surrency v. Harbison*, 489 So. 2d 1097, 1104 (Ala. 1986). But a successful assault "becomes a battery." *Id.* Therefore, in cases (like this) where plaintiffs allege physical contact, courts sometimes treat assault and battery as a single claim. *See Harper v. Winston Cty.*, 892 So. 2d 346, 354 (Ala. 2004) (reviewing the plaintiff's "assault-and-battery claim"); *see also Simmons v. Frank Norton, LLC*, No. 2:15-cv-00147-SGC, 2017 WL 3191094, at *8 (N.D. Ala. July 27, 2017) ("Assault and battery are frequently analyzed together because they involve overlapping elements and facts . . . .").

endeavor to make way through a crowd, is no battery; but to do so rudely and insolently is and may justify damages proportioned to the rudeness.").

Acker submitted ample evidence for all three elements. First, Acker says Swinney touched her three times. (Doc. 126–75 at 24–38.) Swinney twice touched her breasts. (*Id.*) Another time, Swinney "put his arm out and touched [Acker's] butt" as he passed her. (*Id.*) Second, if Swinney repeatedly touched Acker's breasts and "put his arm out" to touch her backside, it can be inferred that the conduct was intentional. Third, by testifying Swinney, without consent, touched these areas of Acker's body, Acker created a question of material fact as to whether Swinney touched her "in a harmful or offensive manner." *See Ex Parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1194 (Ala. 1998) (finding a valid battery claim when employee presented evidence her supervisor intentionally touched her "with sexual overtones"). Acker's assault-and-battery claim survives summary judgment.

Bishop's claim is a different story. She satisfies element one. Accepting Bishop's testimony as true, Swinney touched her in two ways. To speed up a sale, Swinney once used the credit card machine at Bishop's register. (Doc. 126–96 at 26–33.) Swinney "leaned over" Bishop and "brush[ed] against [her] back" as he swiped the customer's credit card. (*Id.* at 23.) Second, sometimes Swinney gave Bishop "office hugs" before morning meetings. (*Id.* at 94.) A jury could find the office hugs intentional. The purposefulness of Swinney's "brushing" is a closer call.

When HWF's lawyers asked Bishop whether she believed Swinney intended to offensively touch her, she couldn't say. (*Id.* at 29.) Assuming Swinney intentionally "brushed" Bishop's back while sliding a credit card, Bishop's claim still fails element three.

The two touchings were neither harmful nor offensive. There were no "substantial sexual overtones." As to the credit-card-machine "brushing," Bishop admits Swinney (1) was helping a customer, (2) was fully clothed, and (3) made no sexual proposition or sexual remarks. (*Id.* at 28–33.) When asked about Swinney's motivations, Bishop cited speed and customer service: "It was close to closing. It was just one of those sales that he could produce quicker than I could at the time, and that's just how it happened." (*Id.* at 28.) Further, Bishop never claims Swinney's hugs were sexual. (*Id.* at 98.) With no sexual overtones, rudeness or insolence, nothing suggests Swinney touched Bishop in an offensive "manner or spirit." For these reasons, summary judgment is due to be granted as to Bishop's assault and battery claim.

## 2. Outrage

The tort of outrage has three elements: (1) the defendant acted intentionally or recklessly, (2) his conduct was extreme and outrageous, and (3) that conduct caused emotional distress "so severe that no reasonable person could be expected to endure it." *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000) (quoting *Green Tree*

*Acceptance, Inc. v. Standridge*, 565 So. 2d 38, 44 (Ala. 1990)). By "extreme," the Alabama Supreme Court means "conduct so outrageous in character and so extreme in degree as go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id.* (quoting *Am. Road. Serv. v. Inmon*, 771 So. 2d 462, 465 (Ala. 2000)).

In *Busby*, the Alabama Supreme Court held that sometimes, in extreme circumstances, sexual harassment can rise to the level of outrage. *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322, 324 (Ala. 1989). However, the *Busby* Court did not explain its reasoning or describe what forms of sexual harassment are "atrocious and utterly intolerable in a civilized society." Instead, *Busby* lists seventeen incidents of sexual harassment and then, with one sentence, holds, "The deposition evidence presented by the plaintiffs presents evidence from which a jury could reasonably determine that [the defendant's] conduct rose to this level." *Id.* Because *Busby* offers little reasoning, the Court can only compare the *Busby* allegations to the allegations of Acker, Bishop, and Poague.

Although Plaintiffs allege numerous incidents of sexual harassment, their allegations are not as severe as those raised by the *Busby* claimants. In *Busby*, a supervisor told female employees "he would put a stick on their [work] machines so they could masturbate while working," "said that he wished that the plaintiffs would come to work braless and wear less clothing," "told one plaintiff that if she would

give him 30 minutes with her that he would fill her pants in nine months," he "openly stared at the plaintiffs' sexual anatomy," he "grabbed their arms and stroked their necks," and he "told one of the plaintiffs . . . to accompany him to the restroom and hold his penis while he urinated." *Id.* Plaintiffs allege serious incidents of harassment. But because those allegations are less severe than those in *Busby*, the Court has no basis to find Plaintiffs' allegations rise to the level of outrage. *Potts*, 771 So. 2d at 465 (describing outrage as an "extremely limited" cause of action). Therefore, summary judgment is due to be granted as to Plaintiffs' outrage claims.

### 3.   HWF's Vicarious Liability

An employer is vicariously liable if, "in addition to proving the underlying tortious conduct of an offending employee," the complaining employee shows her employer ratified that conduct. *Potts v. BE & K Const. Co.*, 604 So. 2d 398, 400 (Ala. 1992). To prove ratification, a plaintiff must show three things: the employer (1) had actual knowledge of the tortious conduct and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take adequate steps to remedy the situation. *Id.* Remedial steps are inadequate unless they are "reasonably calculated to halt the harassment." *Id.* at 401.

Bishop and Poague's vicarious-liability claims as to assault-and-battery (for Bishop) and outrage (for Bishop and Poague) against HWF fail as a matter of law. Because HWF cannot face vicarious liability for common-law torts unless its employee committed those common-law torts, and because, as explained above, Poague and Bishop's common-law tort claims fail, summary judgment is due to be granted as to Bishop and Poague's common-law vicarious-liability claims.[14]

Acker, on the other hand, satisfies all three elements for common-law vicarious liability. First, some evidence suggests HWF had actual knowledge that Swinney's "tortious conduct was directed at and visited upon" Acker. *Id.* According to Acker, Poague complained to upper management on her behalf. (Doc. 138–12 at 8–9.) Assuming that is true, HWF "should have known" the complained-about conduct—touching Acker's breasts and rear-end—constituted sexual harassment. Third, a jury could find HWF's response was not reasonably calculated to stop the behavior. After all, Swinney remained in a managerial position after Poague complained on Acker's behalf.

---

[14] Alabama does not recognize a common-law tort for sexual harassment. *Machin v. Childersburg Bancorporation*, 761 So. 2d 981, 983 n.1 (Ala. 1999) ("It is well settled that Alabama does not recognize an independent cause of action for sexual harassment. Instead, claims of sexual harassment are maintained under common-law tort theories such as assault and battery, invasion of privacy, negligent training and supervision, and outrage.").

4.   **Negligent and Wanton Hiring, Training, and Supervision**

To prove *negligent* training or supervision, Plaintiffs must show three elements: (1) Swinney acted tortuously, (2) HWF had actual notice of Swinney's conduct or "would have gained such notice if it exercised due and proper diligence," and (3) HWF "failed to respond to this notice adequately." *See Shuler v. Ingram & Assocs.*, 710 F. Supp. 2d 1213, 1227–28 (N.D. Ala. 2010) (citing *Voyager Ins. Cos. v. Whitson*, 867 So. 2d 1065, 1070–71 (Ala. 2003)). To prove wantonness, Plaintiffs must show (1) HWF had actual, not just constructive, knowledge of Swinney's misconduct and (2) that Swinney's supervisors "made a conscious decision to downplay the sexual harassment complaint[s] . . . knowing that to do so would likely result" in Swinney "mistreating a female customer or employee." *Big B, Inc. v. Cottingham*, 634 So. 2d 999, 1004 (Ala. 1993) (distinguishing wantonness from negligence).

Bishop and Poague's claims fail as a matter of law. To prevail on either a negligent or wanton supervision claim, a plaintiff must establish that the employer's employee committed a common-law tort. *Ex Parte Transp. Leasing Corp*, 128 So. 3d 722, 728 (Ala. 2013) ("Under Alabama law, the finding of underlying tortious conduct is a precondition to invoking successfully liability for the negligent or wanton training and supervision of an employee.") (quoting *Smith v. Boyd Bros.*

*Transp. Inc.*, 406 F. Supp. 2d 1238, 1248 (M.D. Ala. 2005)).[15] Because the common-law torts alleged by Bishop and Poague did not survive summary judgment, their negligent/wanton supervision and hiring claims must likewise fail. *Id.*

Acker, however, created a question of fact on all three elements. First, Swinney (perhaps) committed the tort of battery. Second, HWF may have had actual knowledge of Swinney's behavior. Again, Poague allegedly complained to management on Acker's behalf. Third, a jury could find HWF's response was inadequate because HWF waited months to terminate Swinney. Seavers—HWF's Director of Stores—admits HWF took no action. Take the following testimony:

> **Plaintiffs' Counsel**: In the last five years, what has Huntsville Wholesale Furniture done to insure [sic] that its employees don't experience discrimination, harassment or retaliation?
>
> **Seavers**: There's no specific thing that's been done I would say.

(*Id.* at 51.) Because a jury could find HWF's knowledge of and its lackluster response to Swinney's alleged battery suggests a "conscious decision to downplay the sexual harassment complaints," summary judgment on Acker's negligent and wanton hiring/supervision claims is due to be denied.

---

[15] Relying on *Machen v. Childersburg Bancorporation, Inc.*, 761 So. 2d 981 (Ala. 1999), Plaintiffs say Alabama allows "claims for negligent hiring, training, and supervision to arise for sexual harassment claims, even when no tort is present." In *Machen*, however, the Court said, "a rational factfinder could find that [the employer] knew, or should have known, that [the employee's alleged conduct], if proven, could constitute a common-law tort." *Id.* at 985. Therefore, nothing in *Machen* suggests an employer can be liable for negligent or wanton hiring or supervision if its employee committed no underlying tort.

## I.   Defendants' Breach-of-Contract Counterclaim Against Acker

On June 19, 2017, Acker met with Hannan (HWF's attorney) and Seavers. She signed a General Release, potentially waiving claims against "Ashley Furniture Homestore, Inc." (Doc. 126–89.) In return, HWF rehired Acker. (Doc. 127–76 at 281–82.)

Defendants say Acker breached the General Release when she joined this lawsuit. (Doc. 125 at 120.) According to Defendants, the Court should enforce the General Release and dismiss all of Acker's claims. (*Id.*) Then the Court should hold Acker liable, as a matter of law, for breach of contract. (*Id.*) For clarity, the Court separates Acker's federal claims from her state-law claims.

### 1.   The General Release and Acker's Federal Claims

Most of Acker's federal claims arise under Title VII. Courts enforce waivers of Title VII claims only if the waivers are knowing and voluntary. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 (1974) (presuming "an employee may waive his cause of action under Title VII as part of a voluntary settlement"). To separate enforceable waivers from unenforceable waivers, courts consider all relevant evidence. *Myriks v. Fed. Rsrv. Bank of Atlanta*, 480 F.3d 1036, 1040 (11th Cir. 2007) ("To release a cause of action under Title VII, the employees consent to the settlement must be voluntary and knowing based on the totality of the circumstances."). The totality-of-the-circumstances analysis begins with six factors:

the plaintiff's education and business experience; the amount of time
the plaintiff considered the agreement before signing it; the clarity of
the agreement; the plaintiff's opportunity to consult with an attorney;
the employer's encouragement or discouragement of consultation with
an attorney; and the consideration given in exchange for the waiver
when compared with the benefits to which the employee was already
entitled.

*Puentas v. UPS, Inc.*, 86 F.3d 196, 198 (11th Cir. 1996) (quoting *Beadle v.
City of Tampa*, 42 F.3d 633, 635 (11th Cir. 1995)).

Two of the six *Beadle* factors weigh in Acker's favor.[16] First, Acker says HWF
gave her little time to read or consider the General Release. (Doc. 126–75 at 81) ("I
was not given time to examine the pages."). Second, Acker never consulted her
attorneys before signing.

Other evidence also suggests Acker did not sign knowingly or voluntarily.
Consider these lines from Acker's deposition:

- "I didn't understand it. I was told, 'Sign this, and you can have your
  job back.'" (*Id.* at 80.)

- "I may have looked at it, but I did not understand it in any way." (*Id.*
  at 81.)

- **Q:** "How long did you look at [this page]?"; **A:** "The same amount
  of time that I was given to look at any other of the pages that I was
  forced to initial, less than two seconds." (*Id.* at 88.)

- "You [HWF's lawyer] were standing giving me the papers telling
  me, 'Sign here, initial here, here,' and then you took the papers
  back." (*Id.* at 84.)

---

[16] Again, at this stage the Court draws all reasonable inferences in Acker's favor. *See Animal Legal Def. Fund*, 789 F.3d at 1213–14.

The two *Beadle* factors, coupled with Acker's testimony, create a question of fact: Did Acker know the General Release waived her Title VII claims, and did she sign voluntarily?[17] These questions will be presented to the jury.

### 2.    The General Release and Acker's State-Law Claims

Alabama courts (usually) enforce unambiguous releases. *See Ex Parte Renovations Unlimited, LLC*, 59 So. 3d 679, 683 (Ala. 2010). And they (usually) consider only the release's text. *Wayne J. Griffin Elec., Inc. v. Dunn Const. Co.*, 622 So. 2d 314, 317 (Ala. 1993). The exception is fraud. If a party alleges fraud, "parol evidence is ordinarily admissible." *Ramsay Health Care, Inc. v. Follmer*, 560 So. 2d 746, 748 (Ala. 1990). Furthermore, a factual dispute as to whether fraud induced one party to sign prevents summary judgment on allegedly-released claims. *Cf. Wayne*, 622 So. 2d at 317 (courts enforce general releases "absent fraud").

The Court denies summary judgment on Defendants' breach-of-contract counterclaim against Acker insofar as it pertains to waiver of her state-law claims because a jury could find HWF fraudulently induced her to sign the General Release. According to Acker, Hannan (falsely) introduced himself as a human-resources expert. (Doc. 126–75 at 74.) A reasonable jury could find Acker would not have

---

[17] Acker also brought a purportedly-waived FLSA claim. As Section IV, *infra*, explains Acker's FLSA claim cannot support a breach-of-contract counterclaim.

signed the General Release—at least not without consulting her lawyers—had she known Hannan was actually HWF's attorney.

## IV.    Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs' summary-judgment motion has two components. First, it seeks summary judgment on Defendants' counterclaims against Acker. Second, the motion attacks three of HWF's affirmative defenses. Part A addresses Defendants' counterclaims. Part B addresses the affirmative defenses. Here, unlike in Section III, the Court views all evidence and draws all reasonable inferences in Defendants' favor. *Animal Legal Def. Fund*, 789 F.3d at 1213–14.

### A.    Counterclaims Against Acker

HWF counterclaimed against Acker for breach of contract, suppression, fraudulent misrepresentation, unjust enrichment, malicious prosecution, and for attorneys' fees under the Alabama Litigation Accountability Act. (Docs. 50 and 56.) Swinney counterclaimed against Acker for breach of contract and for attorneys' fees under the Alabama Litigation Accountability Act. (Doc. 58.) All counterclaims arise from the General Release Acker signed. (Doc. 50 at 7–17.) Below, the Court addresses each counterclaim and each of Acker's arguments for summary judgment. On some issues, Acker wins. Others deserve a trial.

### 1.   Breach of Contract

According to Acker, the General Release she signed was not a binding agreement. (Doc. 122 at 15.) Acker gives five reasons why the Court should invalidate the General Release and dismiss Defendants' breach-of-contract counterclaims.

### i.   Door Closing Statute

Acker's first argument rests on Alabama's "door closing statute," which provides "[a] foreign entity transacting business in this state . . . may not maintain any action, suit, or proceeding in any court of this state until it has registered [with the Secretary of State]." ALA. CODE § 10A-1-7.21 (2020). A "foreign entity" is "an organization formed and existing under the laws of a jurisdiction other than this state." ALA. CODE § 10A-1-1.03 (2020).

Acker points out that "Ashley Furniture Homestore, Inc. is not qualified to do business in the State of Alabama" and is neither incorporated in Alabama nor registered with Alabama's Secretary of State. (Doc. 122 at 16.) Therefore, Acker argues, § 10A-1-7.21 closes the door on HWF's breach-of-contract claim. (Doc. 122 at 16.) The Court rejects Acker's door-closing argument for two reasons.

First, Plaintiffs admitted Ashley Furniture is but a trade name of HWF. (*See* Doc. 122 at ¶ 2.) ("HWF is a licensee of Ashley Furniture that uses the 'Ashley Furniture' brand name to sell furniture."); (Doc. 49 at ¶ 19) ("HWF is a retail home

furniture store conducting business under the name Ashley Furniture Homestore."); (Doc. 49–4) (Acker admits, in an EEOC filing, that HWF does business as Ashley Home Furnishings). And HWF is not a foreign entity; rather, it is a domestic corporation, "formed and existing" under Alabama law and registered with Alabama's Secretary of State. By its terms, § 10A-1-7.21 does not apply to domestic corporations (like HWF).

Second, § 10A-1-7.21 does not differentiate between who contracts with whom. It asks who is "maintain[ing]" the "action, suit, or proceeding." Is *that* entity foreign and unregistered? Even if HWF and Ashley Furniture Homestore were not synonymous, HWF—a domestic, registered corporation—brought and "maintains" the breach-of-contract counterclaim. Therefore, Alabama's door-closing statute does not bar HWF's recovery.

### ii.    Privity Doctrine

Acker's second argument shifts to Swinney. (Doc. 122 at 16.) When Acker signed the General Release, Swinney no longer worked at HWF. (*Id.*) Because the General Release never mentions Swinney by name, and because HWF/Ashley had no relationship with Swinney on June 19, 2017, Acker argues the common-law privity doctrine prevents Swinney from pursuing a breach-of-contract claim. (*Id.*)

To sue for breach of contract, one must either be a) a contracting party or b) a third-party beneficiary. *See Dunning v. New England Life Ins. Co.*, 890 So. 2d 92,

97 (Ala. 2003). Neither side argues Swinney was a party to the General Release.[18] Therefore, Swinney cannot sue for breach of contract unless he was a third-party beneficiary. To earn third-party-beneficiary status, one must show the contracting parties intended, at the time of contract formation, to "bestow a direct benefit upon the third party." *Bernals, Inc. v. Kessler-Greystone, LLC.*, 70 So. 3d 315, 320 (Ala. 2011). When evaluating the directness and intentionality of contractual benefit, courts look beyond a contract's text. *See Holley v. St. Paul Fire & Marine Ins. Co.*, 396 So. 2d 75, 80 (Alabama courts look to "the surrounding circumstances" to "ascertain the existence of [a] direct benefit"). By considering a contract's text alongside "surrounding circumstances," courts glean the contracting parties' intentions. *Cf.* ALA. CODE § 12-21-109 (2020) ("All receipts, releases, and discharges . . . must have effect according to their terms and the intentions of the parties thereto.").

Whether HWF and Acker intended the General Release to "bestow a direct benefit upon" Swinney remains a contested factual question. The General Release's *text* suggests Swinney is a third-party beneficiary. In Section 5(d), Acker (purportedly) waived "all claims, not only against [HWF/Ashley], but also against

---

[18] (Doc. 122 at 17) (Plaintiff argues that "[a]lthough Swinney has pursued a breach of contract claim between him and Acker, there is no contract which exists between the two of them."); (Doc 133 at 23) (Defendants argue "Defendant Taylor Swinney was and is an Intended Third-Party Beneficiary of the General Release.").

all of its . . . employees . . . whether past or present." (Doc. 126–89.) A reasonable juror could infer that, by protecting former employees, HWF benefited Swinney—a former employee exposed to liability. Two *surrounding circumstances* also suggest HWF intended the General Release to benefit Swinney. First, Acker left HWF because of Swinney.[19] Second, Acker returned to HWF, prompting the General Release, because Swinney no longer worked there.[20] Swinney's connection to Acker's departure and return is evidence. It suggests that by mentioning former employees, the General Release's drafters intended to protect Swinney directly. Coupled with the text, those surrounding circumstances create a factual dispute. Acker's privity argument does not support summary judgment in her favor on Defendants' breach-of-contract counterclaim.

### iii.   Prospective Waiver of Title VII Claims

Acker's third basis for summary judgment relies on *United States v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d 826, 855 (5th Cir. 1975). Citing *Allegheny-Ludlum*, Acker argues "there cannot be a prospective waiver of [Title VII] discrimination claims." (Doc. 122 at 18.) At least one Supreme Court decision supports Acker's argument. *See Alexander*, 415 U.S. at 51 ("[W]e think it clear that

---

[19] Acker testified that Swinney caused her departure in March 2017. (Doc. 121–4 at 65.)

[20] Quoting Acker's Deposition, Plaintiff says "Acker learned of Swinney's termination and contacted HWF about returning to work because she 'thought the sexual harassment, discrimination, retaliation would end.'" (Doc. 122 at 9.)

there can be no prospective waiver of an employee's rights under Title VII."). If the General Release *could not* waive Title VII claims arising after June 19, 2017, Acker *did not* breach the General Release by filing Title VII claims that arose after June 19, 2017. Therefore, Acker argues, "summary judgment should be granted on any counterclaim that rests on Acker's pursuit of [Title VII] claims arising" after she signed the General Release. (Doc. 122 at 17.)

Acker's point is moot. By its terms, the General Release applies to "acts or omissions first occurring on or before" the release's execution. (Doc. 126–89.) Nothing suggests the General Release prospectively waives Title VII claims. Defendants admit as much. *See* Doc. 133 at 27 (Defendants concede "[t]he General Release is not a prospective waiver"). Because (1) the General Release's terms do not reach prospective claims and (2) Defendants concede the General Release does not bar claims arising after June 19, 2017, the Court denies Acker's third basis for summary judgment.

### iv.   Public Policy

In a fourth bid to undermine Defendants' breach-of-contract claims, Acker says "conditioning employment on waiver of discrimination claims is unlawful." (Doc. 122 at 18.) She relies exclusively on a recent Eleventh Circuit decision: *Knox v. Roper Pump Company*, 957 F.3d 1237 (11th Cir. 2020). *Knox* held (a) conditioning <u>continued</u> employment on a release of Title VII claims and (b) <u>firing</u>

the employee for refusing to sign is unlawful retaliation. 957 F.3d 1237, 1240 (11th Cir. 2020) ("It is clear from our case law that an employer may not respond to a claim of race discrimination by conditioning continued employment on a release of claims and firing the employee for refusing").

Acker stopped working for HWF in March 2017. Therefore, when Acker signed the General Release (on June 19, 2017), she was not an HWF employee. HWF could not have conditioned "continued" employment on the General Release when Acker's employment ended three months prior. For the same reason—because an employer cannot fire a non-employee—HWF could not have fired Acker for not signing. Because Acker was not an HWF employee when she signed the General Release, *Knox* does not void the General Release.

### v.   FLSA

The General Release (purportedly) waives Acker's claims under the FLSA. (Doc. 126–89.) Because Acker filed FLSA (and other) claims against HWF, Defendants say Acker breached the General Release. Acker disagrees. She argues that, as a matter of law, the General Release could not waive FLSA unpaid-wages claims. (Doc. 122 at 17.) The Court agrees with Acker.

"There are only two ways in which back wage claims arising under the FLSA can be settled or compromised by employees." *Lynn Food Stores, Inc. ex rel. U.S. Dept. of Labor*, 679 F.2d 1350, 1353 (11th Cir. 1982). First, the Secretary of Labor

can supervise a settlement. *Id.* at 1353. Second, a federal district court can approve a settlement *Id.* at 1354 ("[T]o approve an 'agreement' between an employer and employees outside the adversarial context . . . would be in clear derogation of the letter and spirit of the FLSA.").

The General Release does not comply with either settlement method. Nothing suggests the Secretary of Labor supervised the General Release. And no federal district court approved the settlement inside (or outside) "the adversarial context." Therefore, the General Release's FLSA waiver is unenforceable. Because an unenforceable waiver cannot support a breach-of-contract claim, the Court grants summary judgment to the extent Defendants' breach-of-contract counterclaims pertain to Acker's FLSA claim.

### 2.    Suppression and Fraudulent Misrepresentation

On June 19, 2017, before Acker signed the General Release, she answered at least one question. Hannan, HWF's counsel, asked Acker if she filed an EEOC charge against HWF. (Doc. 122 at 11.) A jury could infer that Acker responded "no." (Doc. 121–4 at 75.)

According to HWF, Hannan also asked Acker if counsel represented her. (Doc. 133 at 13.) In his deposition, Seavers, HWF's Director of Stores, recalled both the question and the answer:

Seavers: You . . . asked her again if she was represented by counsel.

Hannan: And what did she say?

Seavers: She said no.

Hannan: No to what?

Seavers: That she was not represented by counsel.

(Doc. 121–3 at 238–39). Acker remembers differently. She says Hannan never asked about counsel. (Doc. 121–4 at 75.)

Assuming HWF asked both questions, the correct answer was "yes." Acker filed an EEOC charge against HWF three months before Hannan's June 19 questioning. (Doc. 121–13.) Attorney Patricia Gill began representing Acker in or around March 2017. (Doc. 122 at 9.)

Based on those two questions and answers, HWF brought counterclaims against Acker for suppression and fraudulent misrepresentation. (*Id.* at 9–13; Docs. 50 and 56.) Acker moved for summary judgment on both counterclaims. (Doc. 122 at 20–23.)

For a suppression claim to survive summary judgment, the claimant must produce "substantial evidence" establishing four elements. *State Farm Fire and Cas. Co. v. Owen*, 729 So. 2d 834, 837 (Ala. 1998) First, the allegedly-suppressing party must have a duty to disclose information. *Id.* A duty to disclose arises from "the confidential relationship between the plaintiff and the defendant, from the particular circumstances of the case, [or] from a request for information." *Lawson v. Harris*

*Culinary Enters.*, 83 So. 3d 483, 492 (Ala. 2011); *see Mason v. Chrysler Corp.*, 653 So. 2d 951, 954 (Ala. 1995) ("A duty to communicate can arise from a . . . request for information . . . ."). The existence of a duty is a question of law. *Ex parte Dial Kennels of Ala., Inc.*, 771 So. 2d 419, 421 (Ala. 1999); *State Farm*, 729 So. 2d at 839.

Second, the claimant must show the movant suppressed a "material fact." *State Farm*, 729 So. 2d at 837. A material fact "is of such a character that the [complaining party] would not have consummated the contract, had he known the falsity of the statement." *Bank of Red Bay v. King*, 482 So.2d 274, 282 (Ala. 1985). Unlike duty, a statement's materiality is generally not a question of law. *Id.* at 282 (explaining how "the materiality of a given fact is a question for the jury").

Third, the claimant must show the allegedly-suppressing party had "actual knowledge" of the suppressed fact. *Johnson v. Sorenson*, 914 So. 2d 830, 837 (Ala. 2005). Fourth, the non-movant must show he suffered "actual damage as a proximate result" of the other party suppressing the material fact.

Here, HWF submitted enough evidence to survive summary judgment on element one (duty). Hannan "directly requested" information from Acker. He asked if she filed an EEOC charge against HWF. If the jury believes Seavers's testimony, Hannan also asked her if she was represented by counsel. Because Hannan directly requested this information, Acker had a duty. *Ex parte Life Ins. Co. of Ga.*, 810 So.

2d 744, 749 (Ala. 2001) ("[E]ven in an arm's-length transaction between parties fully capable of protecting their own interests a duty to disclose will arise when the information has been specifically requested.").

HWF survives summary judgment on element two. Viewed in the light most favorable to HWF, Acker suppressed two facts. She potentially suppressed her pending EEOC charge, and she potentially suppressed that counsel represented her. One question remains: were these suppressed facts material? It's a close call.[21] On the one hand, HWF's brief never points to specific testimony or affidavits saying HWF would not have "consummated" the General Release had HWF known of Acker's pending EEOC charge or about her legal representation. *See Ex parte Dial*, 771 So. 2d at 422 (claimants presented deposition testimony and affidavits showing they "would not have entered into [an] agreement" but for the suppressed fact). On the other hand, materiality is a question for juries. *Bank of Red Bay*, 482 So. 2d at 282. With that in mind, one piece of evidence saves HWF's materiality claim: Seavers testified Acker was ineligible for rehire. (Doc. 121–3 at 180.) HWF deemed Acker "non-rehirable" because "she walked off the job" three months earlier. *Id.*

---

[21] Without citing to the record, Defendants' Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment says "HWF . . . would not have agreed to rehire Acker if it had known she did not intend to dismiss her charge and would file suit." (Doc. 133 at 39.) Because Defendants cite to no record evidence, the Court ignores this sentence. *See English v. CSA Equipment Co., LLC.*, No. 05-0312-WS-B, 2006 WL 2456030, at *2 (S.D. Ala. Aug. 22, 2006) ("A summary judgment brief is not evidence; rather, it is simply the argument of counsel. In the overwhelming majority of cases, the proper judicial response to a factually unsupported . . . argument is simply not to credit it."). The Court limits its "materiality" analysis to record evidence.

HWF made an exception. It rehired Acker, according to Seavers, because she signed the General Release and waived her claims against HWF. A reasonable jury could infer, from this exception, that HWF would not have entered the General Release or rehired Acker had it known she already was pursuing EEOC charges and had already hired representation.

Next, Acker had "actual knowledge" of the facts she (allegedly) suppressed. Acker knew she filed an EEOC charge in March 2017, and she knew she hired an attorney before the June 2017 meeting.

Assuming elements one through three are met, a reasonable jury could find HWF suffered "actual damages." HWF rehired Acker and employed her for at least six months and paid her six months of wages. (Doc. 122 at 14.)  Whether Acker suppressed a material fact, and whether such a suppression proximately caused HWF damages, remain contested questions of fact.

The elements of suppression and fraudulent misrepresentation align closely. *Compare State Farm*, 729 So. 2d at 837 (listing fraudulent suppression elements) *with Boswell v. Liberty Nat'l Life Ins. Co.*, 643 So. 2d 580, 581 (Ala. 1994) (listing fraudulent misrepresentation elements). Plaintiff's fraudulent misrepresentation argument rests on one element (materiality). (Doc 122 at 22–23.) Rehashing suppression arguments, Acker says her statements to Hannan did not induce HWF to execute the General Release and rehire her. (*Id.* at 23.) HWF raises no new

counterarguments. The Court again leaves materiality to the jury and denies Acker's motion for summary judgment as to HWF's fraudulent misrepresentation counterclaim.

### 3.  Unjust Enrichment

Acker worked at HWF for six months after she signed the General Release. (Doc. 122 at 14.) HWF contends that because Acker planned to sue HWF when she signed, she unjustly enriched herself—she reobtained employment through fraud. HWF wants Acker "to return the difference between her earnings at HWF and the federal minimum wage." (Doc. 122 at 42.)

Although unjust enrichment is fact-specific, "the essence" of unjust enrichment is consistent: the defendant "holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to defendant because of mistake or fraud." *Hancock-Hazlett Gen. Constr. Co. v. Trane Co.*, 499 So. 2d 1385, 1387 (Ala. 1986) (emphasis added). However, a defendant has a "complete defense" if he or she is not in possession of money not rightfully his or hers. *Dickinson v. Cosmos Broad. Co, Inc.*, 782 So. 2d 260, 266 (Ala. 2000).

"In equity and good conscience," Acker's wages do not "belong to" HWF. Acker signed the General Release on June 19, 2017. Within two days, HWF learned Acker had legal representation. (Doc. 122 at 13.) One day later, HWF learned of Acker's pending EEOC charge. (*Id.*) Still, HWF employed Acker for six months.

(*Id.* at 14.) With knowledge of her alleged fraud, HWF allowed Acker to work and earn money. By allowing Acker to work, despite knowing about her alleged wrongdoing, HWF undercut its equitable argument. *Cf. Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto Ins. Co.*, 945 F.3d 1150, 1161–62 (11th Cir. 2019) (applying Florida law, the Eleventh Circuit explained that a wronged party is less likely to recover for unjust enrichment if it conferred a benefit on the wrongdoer with knowledge of the wrongdoing); *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249 (11th Cir. 2019) (same). Because HWF does not dispute Acker earned the money HWF seeks, and because HWF continued employing Acker after learning about her alleged fraud, her wages cannot support a claim for unjust enrichment. Summary judgment is due to be granted as to HWF's unjust-enrichment counterclaim.

### 4.    Malicious Prosecution

Because Acker allegedly filed released claims, HWF counterclaimed for malicious prosecution. (Doc. 50 at 14–15.) To prevail, HWF must show five things: (1) that Acker initiated a judicial proceeding, (2) without probable cause and (3) with malice, (4) that the proceeding terminated in HWF's favor, and (5) that HWF suffered damages because of Acker's malicious prosecution. *See Cutts v. Am. United Life Ins. Co.*, 505 So. 2d 1211, 1214 (Ala. 1987). A malicious-prosecution claim does not arise until the claimant wins the allegedly-malicious case. *Barrett Mobile*

*Home Transp., Inc. v. John McGugin*, 530 So. 2d 730, 731 (Ala. 1988) (calling final termination of the underlying claim "an essential element in the accrual of a malicious prosecution action").

HWF's malicious-prosecution claim fails as a matter of law. The underlying case—Acker's discrimination suit—has not "terminated." Therefore, as *Barrett* explained, HWF's claim has not accrued. Without that "essential element," summary judgment is due to be granted as to this claim.

### 5.   Alabama Litigation Accountability Act

Because Acker filed (allegedly) released claims, Defendants counterclaimed for attorneys' fees. (Docs. 50 and 58). Defendants' counterclaim rests on ALA. CODE § 12-19-273 (2020). Section 12-19-273 allows courts to, in their "sound discretion," award attorneys' fees to a prevailing party. *See Austill v. Prescott*, 293 So. 3d 333, 350 (Ala. 2019). The Court will address this issue if and when it becomes appropriate.

### B.   Affirmative Defenses

Plaintiffs seek summary judgment on three affirmative defenses. The Court grants the motion in part and denies the motion in part.

### 1.   *Faragher* Defense

If an employee states an actionable hostile-environment claim, he or she can hold his or her employer vicariously liable when "a supervisor with immediate (or

successively higher) authority over the employee[s]" creates the hostile environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). *Faragher* gives employers an affirmative defense.[22] *Id.* Employers escape vicarious liability by (a) "exercising reasonable care to prevent and correct promptly any sexually harassing behavior" and (b) by showing the victims "unreasonably failed to take advantage of any preventative or corrective opportunities" to avoid harm. *Id.*

Creating and disseminating an antiharassment policy is evidence that can be utilized to show that an employer took "reasonable care" to prevent harassment. *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1297 (11th Cir. 2000) (employers can "meet the initial burden in determining whether they had exercised reasonable care to prevent sexual harassment by promulgating an anti-harassment policy"). Warning an alleged harasser is one step an employer may take to correct sexually harassing behavior. *See Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1305 (11th Cir. 2007) (citing *Fleming v. Boeing Co.*, 120 F.3d 242, 246– 47 (11th Cir. 1997)).

An employee's failure to complain is evidence relevant to *Faragher*'s second prong. *Madray*, 208 F.3d at 1301. By showing an employee did not follow complaint procedures, an employer "normally" satisfies its summary judgment "burden under

---

[22] The defense only applies when harassment involved no "tangible employment action." *See Hulsey*, 367 F.3d at 1245–46.

the second element of the affirmative defense." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

Viewing all evidence in HWF's favor, HWF took the following steps: it created an anti-sexual-harassment policy, distributed the policy to every new employee, displayed EEOC posters and sexual-harassment resources throughout stores, advertised a toll-free number for harassed employees to call, and made human resources experts available for victimized employees. (*See* Doc. 133 at 46.) Creation and dissemination of the policy, taken on its own, "suggests" HWF took enough preventative measures to survive summary judgment. Considered alongside these other measures, a jury could find HWF's preventative efforts reasonable.

Further, a jury could find HWF made "reasonable effort[s]" to promptly correct harassing behavior. According to Plaintiffs, HWF took only one corrective measure: Seavers asked "two of the persons accused of misconduct if they used the word 'Omaha.'" (Doc. 122 at 30.) Defendants disagree. HWF says that when Poague complained about sexual harassment, CEO Chris Caune investigated, and Executive Administrator Nancy Malone visited Tuscaloosa's store where she spoke with Poague, and Seavers told Swinney to stop the harassing behavior. Whether these efforts were reasonable and prompt raises difficult (and material) factual questions that should be considered by the jury.

Finally, questions of fact as to *Faragher*'s second prong also prevent summary judgment. Acker complained to Swinney about Swinney's sexualized conversations with Riggsby (Doc. 143 at 64), Poague complained multiple times, and Bishop complained to Washington and Vetrano. (*Id.*) Were these complaints reasonably detailed and prompt? Did Poague, Acker, and Bishop use HWF's other anti-harassment channels? If not, why? These factual questions may determine whether Plaintiffs took reasonable advantage of corrective opportunities. The jury will determine the success or failure of HWF's *Faragher* defense.

### 2.    After-Acquired-Evidence Defense

If, during litigation, an employer learns that a former employee committed acts while employed that would have justified termination, the employer can raise an after-acquired-evidence defense. *Wallace v. Dunn Const. Co., Inc.*, 62 F.3d 374, 378 (11th Cir. 1995) (extending the defense to Title VII claims). If successful, the defense bars the former employee from seeking reinstatement or front pay. *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362 (1995).

Because after-acquired evidence is an affirmative defense, HWF bears the burden of proof. *Holland v. Gee*, 677 F.3d 1047, 1065 (11th Cir. 2012). It must show the "wrongdoing was of such severity that [the plaintiffs] would have been terminated on those grounds alone if [HWF] had known of it at the time of the discharge." *McKennon*, 513 U.S. at 362–63.

HWF alleges that all three plaintiffs committed termination-worthy offenses. According to HWF, Acker "walked off the job" without cause. (Doc. 133 at 49.) It learned Acker had no reason to resign only after litigation and investigation. (*Id.*) HWF learned, through investigation, that Bishop requested reassignment—asked her staffing company to move her from HWF. (*Id.*) And it learned, through litigation, that Poague was "insubordinate" and "disrespectful" to management. (*Id.*) It appears doubtful that any of these actions are sufficient to meet the burden, but that will be an issue for the jury assuming HWF carries its burden at trial.

### 3.    Failure-to-Mitigate Defense

Failure to mitigate is an affirmative defense. *Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1286 (11th Cir. 2000). HWF must show Plaintiffs "failed to mitigate [their] damages by using reasonable diligence to find substantially equivalent employment." *Weaver c. Case Gallardo, Inc.*, 922 F.2d 1515, 1527 (11th Cir. 1991) (a successful defense shows "that comparable work was available and the [plaintiffs] did not seek it out").

HWF met its burden as to Poague. Poague admits she did not work for months—perhaps more than a year—after she left HWF. (Doc. 126–13 at 151–162.) She went several months without even seeking employment. (*Id.*) Waiting several months to seek employment may not be reasonable diligence. Therefore, Poague may have failed to mitigate her Title VII damages.

HWF, however, submitted no evidence that Acker and Bishop failed to mitigate. After leaving HWF, Acker soon found new employment. (Doc. 126–75 at 66–69.) Nothing suggests Acker turned down "comparable work" or delayed reemployment. Similarly, HWF offers no evidence that Bishop failed to mitigate. (*See* Doc. 133 at 50.) HWF cited no evidence that "comparable work was available" or that Bishop failed to use "reasonable diligence to find substantially equivalent employment." By not citing any such evidence, HWF failed to meet the failure-to-mitigate burden as to Acker and Bishop.[23] Summary judgment is due to be granted as to this affirmative defense as asserted against the claims of Acker and Bishop.

## V.   Motions to Strike

Defendants filed two motions to strike. The Court DENIES in PART and TERMINATES as MOOT in PART the first motion. (Doc. 149.) The Court TERMINATES as MOOT the second motion. (Doc. 158.)

### A.   First Motion to Strike

Defendants say Poague and Acker's depositions contradict their later-filed declarations. (*See* Doc 149 at 1) ("Both plaintiffs' declarations are, at times, inherently contradictory, and make statements not based on personal knowledge.").

---

[23] Plaintiffs' counsel asked Seavers—HWF's 30(b)(6) deponent—if he was "aware of any employment opportunities which any of the Plaintiffs have failed to take advantage of." Seavers answered. "Not that I'm aware of, no." (Doc. 121–3 at 165–66.) With no deposition testimony and no other briefed evidence, no reasonable juror could find Bishop and Acker failed to mitigate lost wages.

Defendants say the "contradictory" declarations are "inadmissible and should be stricken from the record." (*Id.*)

In limited circumstances, district courts can strike "sham affidavits." *Van T. Junkins and Assocs., Inc. v. U.S. Industrs., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). If a party gives "clear answers to unambiguous questions," she cannot later offer "an affidavit that merely contradicts, without explanation, previously given clear testimony." *Id.*

Mere inconsistency does not make an affidavit a sham. *Tippins v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1984) ("A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence."). Even if an affidavit is at odds with deposition testimony, the district court should submit both to the jury and let jurors weigh credibility. *See Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980).

Most of Acker and Poague's declarations are not inconsistent with their testimony. Take Defendants' third objection to Poague's declaration. (*See* Doc. 149 at 12.) Poague testified she heard Swinney say "deez nutz" and grab his genitals. (Doc. 126–12 at 237–240.) Defense counsel asked her: "Did you complain to anyone other than Taylor Swinney that this offended you . . . that you didn't think this was funny and it was offensive?" (*Id.*) Poague answered "no." (*Id.*) In her declaration,

Poague said "I responded to Mr. Swinney that he was gross." (*Id.*) Defendants say "[t]he Court should strike or disregard at summary judgment any statements in Poague's declaration that she ever objected to Swinney about these alleged jokes." (Doc. 149 at 13.) The Court disagrees. These two statements are reconcilable. Poague never complained to anyone "other than" Swinney or told Swinney the statements were "offensive"; she complained to Swinney and told Swinney the statements were "gross." The Court sees no contradiction.

When declarations and testimony conflict, Plaintiffs explain why. For instance, Poague testified Swinney "sort of looked at her with a blank stare" when she asked to pump breastmilk. (Doc. 126, Ex–12 at 42–45.) Her affidavit, however, says Swinney "smirk[ed], [and] stare[d] at [her] breasts." (Doc. 138–13 at ¶ 64.) Assuming these conflict, Poague explains herself: her memory "changes as more information [becomes] available." (*Id.* at ¶ 90.) A jury can accept or reject the explanation. Perhaps her memory changed. Perhaps not. But Poague offered *an* explanation. Therefore, the sham-declaration rule does not apply. The Court leaves credibility determinations to the jury.

The Court DENIES IN PART Doc. 149. The Court MOOTS Doc. 149 to the extent it challenges declarations not referenced in this Memorandum of Opinion.

### B.    Second Motion to Strike

Defendants also moved to strike Doc. 156. (Doc. 158.) This Memorandum of Opinion neither relies on nor references Doc. 156. Therefore, the Court MOOTS Doc. 158.

## VI.   Defendant Swinney's Opposition to Evidence

Swinney objects to certain evidence "placed under seal by the Circuit Court of Jefferson County." (Doc. 128.) This Memorandum of Opinion neither relies on nor references that sealed evidence. Therefore, the Court MOOTS Swinney's objection (Doc. 128).

## VII.  Conclusion

The Court GRANTS IN PART and DENIES IN Part Defendants' Motion for Summary Judgment (Doc. 124). The Court GRANTS IN PART and DENIES IN Part Plaintiffs' Motion for Partial Summary Judgment (Doc. 120). The Court DENIES IN PART and TERMINATES AS MOOT IN PART Defendants' First Motion to Strike (Doc. 149). The Court TERMINATES AS MOOT Defendants' Second Motion to Strike (Doc. 158). The Court TERMINATES AS MOOT Swinney's Opposition to Evidence (Doc. 128). The Court will enter an Order consistent with this Memorandum of Opinion.

**DONE** and **ORDERED** on October 29, 2020.

L. Scott Coogler
United States District Judge

203323