FILED

2020 Dec-08  PM 02:47
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

MICHELLE POAGUE, et al.      )
                             )
     Plaintiffs,         )     Civil Action No.:
                             )
v.                         )     7:18-cv-00005-LSC
                             )
HUNTSVILLE WHOLESALE    )
FURNITURE d/b/a ASHLEY     )
FURNITURE HOMESTORE, et al.  )
                             )
     Defendants.         )

## **PRETRIAL ORDER**

A pretrial conference was held in the above case on December 8, 2020, wherein, or as a result of which, the following proceedings were held and actions taken:

(1)    <u>APPEARANCES:</u> Appearing at the conference were:

For Plaintiff Michelle Poague:    Patricia A. Gill
                                         Heather N. Leonard

For Plaintiff Lorrie Acker:    Patricia A. Gill
                                         Heather N. Leonard

For Plaintiff KaTarda Bishop:    Patricia A. Gill
                                         Heather N. Leonard

For Defendant Huntsville    Daniel A. Hannan
Wholesale Furniture, Inc.:    H. Wallace Blizzard
                                         John E. McCulley

1

For Defendant Taylor Swinney:        H. Wallace Blizzard

(2)     <u>JURISDICTION AND VENUE:</u>

a.      The Court has subject matter jurisdiction of this action under the following statutes, rules, or cases: 28 U.S.C. §§ 1331 and 1343 because it arises under federal statutes. The Court has supplemental jurisdiction over the plaintiffs' state law claims and the defendants' counterclaims pursuant to 28 U.S.C. §1367. Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b).

b.      All jurisdictional and procedural requirements prerequisite to maintaining this action have been met, except that:

   (i)     The defendants object that plaintiff Michelle Poague failed to satisfy administrative prerequisites for a promotion claim and failed to plead the claim in her *Second Amended Complaint*.

   (ii)    Michelle Poague did not satisfy administrative prerequisites for a pay discrimination claim related to her hourly rate of pay and did not plead the claim in her *Second Amended Complaint*.

   (iii)   There is a dispute between the parties as to whether plaintiff Acker satisfied administrative prerequisites for any claims arising out of her second term of employment with HWF.

c.      The defendants to do not contest personal jurisdiction or venue.

(3)   <u>PARTIES AND TRIAL COUNSEL:</u> Any remaining fictitious parties are hereby STRICKEN. The parties before the Court and designated trial counsel are correctly named as set out below.

| PARTIES | TRIAL COUNSEL |
|---------|---------------|
| Plaintiff Michelle Poague | Patricia A. Gill<br>Heather N. Leonard |
| Plaintiff Lorrie Acker | Patricia A. Gill<br>Heather N. Leonard |
| Plaintiff KaTarda Bishop | Patricia A. Gill<br>Heather N. Leonard |
| Defendant Huntsville Wholesale Furniture, Inc. | Daniel A. Hannan<br>H. Wallace Blizzard<br>John E. McCulley |
| Defendant Taylor Swinney | H. Wallace Blizzard |

(4)   <u>PLEADINGS:</u> The following pleadings have been allowed:

- Second Amended Complaint (Doc. 49);

- Defendant HWF's Amended Counterclaims Against Plaintiff/Counterclaim Defendant Lorrie Acker (Doc. 50);

- Answer of Defendant Huntsville Wholesale Furniture to the Second Amended Complaint, HWF Statement of Affirmative and Additional Defenses and Amended Counterclaims against Plaintiffs Acker and Poague (Doc. 56);

3

- Defendant Taylor Swinney's Amended Answer, Statement of Affirmative and Additional Defenses, and Counterclaim Against Plaintiff Lorrie Acker (Doc. 58);

- Acker's Answer to Swinney's Counter-Claim Complaint and Amended Counter-Claim Complaint. (Doc. 62);

- Acker's Answer to HWF's Amended Counter-Claim Complaint (Doc. 63).

(5)   <u>STATEMENT OF THE CASE:</u>

a.   <u>Narrative Statement of the Case.</u>

Huntsville Wholesale Furniture, Inc. ("HWF") is a corporation that operates furniture stores in various cities in Alabama under the business name "Ashley Furniture Homestore" ("HWF"). One of HWF's stores is located in Tuscaloosa, Alabama. Plaintiffs Michelle Poague and Lorrie Acker were employed at this store as Product Specialists (salespersons), and Plaintiff KaTarda Bishop worked at the Tuscaloosa store through Express Employment Professionals, Inc. as a Cashier. HWF hired Defendant Taylor Swinney as a Product Specialist in 2012 and promoted him to Store Manager on January 13, 2016, which was during the time period the plaintiffs were employed.

Poague, Acker, and Bishop allege that they were subject to a sexually hostile work environment and were constructively discharged. Poague and Acker allege

HWF treated them differently than men during their employment. Poague and Bishop each allege HWF retaliated against them for their complaints of sexual harassment and/or disparate treatment. Acker alleges that Swinney committed assault and battery upon her. Acker alleges HWF is liable for that assault and battery on the theory of respondeat superior. Acker also alleges HWF is liable for negligent and wanton hiring, training and supervision.

HWF and Swinney deny all of the allegations and claims by plaintiffs and demand strict proof thereof. HWF denies that Poague was subjected to pregnancy discrimination or was not provided break time to breast feed or pump or a satisfactory location in which to do so. HWF denies that it delayed or interfered with Poague's alleged need for Family Medical Leave Act ("FMLA") leave or retaliated against her for requesting or taking such leave. HWF denies that that the plaintiffs, or any employees of HWF, were subjected to sexual harassment, sex discrimination, or retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. The plaintiffs were not constructively discharged.

HWF and Swinney deny that Swinney committed any tortious conduct against any of the plaintiffs or that HWF condoned or ratified any such alleged tortious conduct. Swinney denies that he assaulted or battered plaintiffs Acker. HWF and Swinney deny that any of the plaintiffs are entitled to monetary damages, compensatory damages, or punitive damages.

HWF and Swinney maintain the <u>Confidential Settlement Agreement and Full and Final General Release</u> is a valid and enforceable agreement among them and Acker and brought a counterclaim alleging that Acker breached that agreement when she brought this lawsuit. HWF brought a counterclaim against plaintiff Lorrie Acker for the torts of Suppression and Fraudulent Misrepresentation alleging that she failed to disclose that she had filed a charge of discrimination or that she was represented by counsel when she signed the <u>Confidential Settlement Agreement and Full and Final General Release</u>. .

HWF asserts the *Faragher* affirmative defense and asserts that it took reasonable care to prevent and correct any sexually harassing behavior and the alleged victims failed to take advantage of any preventative corrective opportunities to avoid harm.[1] HWF asserts the after-acquired evidence defense against Poague and Acker. HWF asserts the affirmative defense that plaintiff Michelle Poague failed to mitigate her damages.

The Plaintiff/Counterclaim Defendant, Lorrie Acker denies the allegations asserted by HWF or Swinney and demands strict proof thereof. Acker maintains there is not a valid contract and has asserted various defenses including the

---

[1]     Plaintiffs object to this sentence being read to the jury as part of a preliminary instruction. The Plaintiffs intend on filing a motion in limine on *Faragher* issues. However, if that motion is denied, the Plaintiffs do not object to the wording of this statement.

agreement was obtained through fraud and coercion, Acker did not knowingly and voluntarily agree to waive any claims against Swinney or HWF, neither Swinney nor HWF relied on the agreement, neither Swinney nor HWF gave Acker anything of value for the agreement, and that neither Swinney nor HWF suffered any damages. She denies the defendants are entitled to legal fees and costs.

        b.    <u>Undisputed Facts.</u>

1.    HWF hired defendant Taylor Swinney as a Product Specialist on February 8, 2012.

2.    In November 2014, HWF hired Michelle Poague as a Product Specialist.

3.    Poague took approximately two months of leave around the time her son was born, which was in late October 2015.

4.    On January 13, 2016, HWF promoted Swinney to management.

5.    On July 7, 2016, Poague submitted a letter to HWF requesting leave under the Family and Medical Leave Act ("FMLA").

6.    Poague returned to work from FMLA leave in October 2016.

7.    Acker started working for HWF on October 12, 2016.

8.    In November 2016, Express Employment Professionals, Inc., a staffing company used by HWF, placed Bishop to work at HWF as a cashier.

9.    On December 8, 2016, Poague filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC").

10.     On February 17, 2017, Poague resigned from HWF.

11.     On February 17, 2017, Poague filed a Supplemental Charge of Discrimination with the EEOC.

12.     On March 7, 2017, Acker filed a Charge of Discrimination with the EEOC.

13.     The last day Acker worked for HWF was March 14, 2017.

14.     On May 3, 2017, Express Employment Professionals, Inc. pulled Bishop from working at HWF.

15.     HWF terminated Swinney's employment on May 9, 2017.

16.     In June 2017, Acker contacted HWF Director of Stores Jason Seavers and asked to return to work at HWF.

17.     On June 19, 2017, Acker met with Seavers and HWF's attorney, Daniel Hannan.

18.     On June 22, 2017, Acker reported to work at HWF's Tuscaloosa store.

19.     On June 22, 2017, Acker submitted a second application to HWF.

20.     On July 10, 2017, Bishop filed a Charge of Discrimination with the EEOC.

21.     On November 17, 2017, Acker's employment with HWF terminated.

22.     On January 2, 2018, Plaintiffs filed this action.

  c. <u>Plaintiffs' Claims.</u>

## I. HOSTILE WORK ENVIRONMENT

Plaintiffs Acker, Poague and Bishop each state a claim against Huntsville Wholesale Furniture ("HWF") for hostile work environment. They each suffered from several incidents of gender-or- sex related harassment amounting to a hostile work environment. The gender-or-sex related comments came from the General Manager, the Assistant General Manager and male co-workers. The harassment was based on sex or gender.

There is nothing to indicate Acker, Bishop or Poague wanted or encouraged the harassment. Acker protested the conduct and Swinney told her if she "can't take the heat, get out of the kitchen". Acker testified the harassment "affected [her] emotional well-being", negatively impacted her sales, and caused her to develop "stress-induced ulcers". Bishop testified she felt "uncomfortable" and complained to Washington and Vetrano about Swinney "violating" her personal space and inappropriate body contact. Poague objected to Riggsby and Swinney to stop and not use sexist language. She said his conduct was "gross", sexist, and offensive. This evidence establishes the harassment was not wanted or encouraged by Acker, Poauge or Bishop.

The harassment was subjectively and objectively severe and pervasive enough to affect the conditions of their employment. Some of the harassment occurred frequently. Swinney used the word "Omaha" to flag attractive female customers "every time" one walked in and Swinney and Gibson degraded women "on a daily

basis" at HWF's break table. Swinney conduct grabbing his crotch and throwing money at Bishop "like she was a stripper or whore" was humiliating and unreasonably interfered with Bishop's job performance. Poague was forced to work through breast pain and discomfort, with lactation leaking through her shirt, which was humiliating and severe. Gibson threatened Poauge by cornering and threatening her which is physically threatening. The conduct Acker was subjected to was also severe and physically threatening. Swinney touched Ackers breast twice and her rear end once. The harassment unreasonably interfered with each of the Plaintiffs' emotional well-being and sales. Acker specifically stated it affected her emotionally and interfered with her job performance. Bishop stated she was "uncomfortable" and complained to Washington and Vetrano about Swinney violating her personal space and inappropriate body contact. Poague objected to Riggsby and Swinney to stop and not use sexist language. She said his conduct was "gross", sexist and offensive. She complained multiple times to management.

There is a basis to hold HWF liable. HWF had actual notice of Swinney's behavior because it knew of the harassment due to the fact most of the harassment involved the Store Manager and Assistant Manager. HWF also had actual knowledge of the harassment because Poague complained to upper management which included harassment suffered by both Poague, Acker and other women. Bishop also

complained to upper management. HWF did nothing to curtail the harassment. HWF did not even plead the Faragher defense.

## II.   CONSTRUCTIVE DISCHARGE

Plaintiffs Acker, Poauge and Bishop each state a claim for constructive discharge against HWF. HWF deliberately made Acker, Poague and Bishop's working conditions intolerable. As stated above, the harassment altered the terms and conditions of their employment. There is a causal link between the allegedly intolerable conditions and their resignation. According to Acker, Swinney left her "no choice but to leave". She stated "The abuse of my work environment effectively terminated my employment because Huntsville Wholesale Furniture did nothing to stop the harassment I was experiencing. My only choices were remain and continue to be abuse or leave to escape the abuse". Poague's resignation letter called HWF's environment "dehumanizing" and "abusive". And in a letter to management, Bishop says she "was forced to quit her job because the harassment embarrassed her and scared her. They each endured harassment that was so unbearable that a reasonable person would be compelled to resign. HWF had sufficient time to stop the harassment. Plaintiffs alleged scores of incidents, and evidence suggests HWF had knowledge but did not act promptly. HWF had actual notice of the harassment and did nothing to prevent it.

## III.   PREGNANCY DISCRIMINATION

Plaintiff Poague states a claim for pregnancy discrimination against HWF. Poague was breastfeeding so she belonged to a protected class. She sought the accommodation of part time hours with part time sales requirements. Her employer did not accommodate her and instead gave her an ultimatum of working part time hours but making full time sales requirements or go on a "performance improvement plan". HWF accommodated others by reducing hours to those who attended school and who were similar in "their ability or inability to work". However, HWF never placed these employees on improvement plans. HWF does not present a legitimate non-discriminatory reason for failing to accommodate Poague. It instead claims it did accommodate Poague. Regardless, HWF had policies for accommodating non-pregnant (breastfeeding) workers to the point that the reasons for failing to accommodate pregnant (breastfeeding) workers gives rise to an inference of intentional discrimination.

## IV.   DISPARATE TREATMENT

Plaintiffs Poague and Acker each state a claim against HWF for disparate treatment. Poague and Acker, as females, are a member of a protected class. Swinney rejected sales for female Product Specialists then approved identical sales for male Product Specialist resulting in a loss of commission. Swinney ignored the "Up-System" a tool to randomly assign customers to salespersons-and gave female

Product Specialists' customers to male Product Specialists. Specifically, he gave their sales to Gibson- a male product specialist- even though she was next in the "Up" rotation. Poague was also required to clock out for smoke breaks when Gibson was not resulting in lost wages.

Gibson, a similarly-situated employee who was in the same position, engaged in the same basic conduct as, and under the jurisdiction of the same supervisor, was subject to the same policies or rules as Acker and Poauge, including the "Up System".

Acker and Poauge were each qualified for the position which is not contested by the Defendant.

HWF does not state a legitimate non-discriminatory reason for why sales were taken from female Product Specialists, or why they deviated from the Up-System. As such, HWF cannot justify why Gibson was allowed to make sales at lower margins.

## V.   <u>**RETALIATION**</u>

Plaintiffs Poague, and Bishop each state a claim for retaliation against HWF. Poague engaged in protected conduct. Poague complained: 1) to management on November 3, 2016; 2) to the EEOC on December 8, 2016, 3) to Swinney on December 31, 2016, and 4) to management when she resigned. Poague suffered many adverse actions. Among other actions, she did not receive her bonus check.

Swinney told an employee he planned to "get rid of Poauge". Management falsely listed Poague's sales as undelivered costing her commission. Swinney also screamed at and threatened Poague about filing her charge. Each of these actions "might well dissuade" someone from complaining. Each of these adverse actions occurred within two months of her complaint to Malone, and within three weeks of her EEOC charge establishing the complaint and adverse actions were not unrelated. HWF does not have a legitimate non-discriminatory reason to explain why Poague did not receive her bonus, why Swinney threatened to fire Poague, or why did management falsely list Poauge's sales as undelivered. Poauge had no chance to show pretext.

Bishop complained to Washington and Vetrano about Swinney's conduct. After complaining, HWF cut Bishop's hours in half. Halved income "might well dissuade" someone from complaining. Bishop says she complained in March 2017 and her hours were reduced in April 2017. Thus, the complaint and reduced hours were not completely unrelated. Once again, HWF does not have a legitimate non-discriminatory reason to show why it cut Bishop's hours. Bishop had no chance to show pretext.

## VI.  FMLA

Poauge states a claim for interference and retaliation in violation of the FMLA against HWF.  In the spring of 2016, Poague's son was not growing at a normal pace. In July, she took her son to Dr. Kelton, a pediatrician. Dr. Kelton called

Poauge's son "underweight". He believed Poague's son would not eat at daycare and would only nurse. According to Dr. Kelton, this was a chronic condition requiring periodic visits for treatment. In other words, a serious health condition. He recommended Poauge stay home for 12 weeks to nurse her baby and return him to a healthy weight. The FMLA entitled her to these benefits. Poague approached Swinney and told him her baby was not gaining weight like he should and explained she was worried about him and wanted to take leave. Unlike births and planned treatments, a baby's chronic inability to gain weight is neither expected or scheduled thus 30 days' notice was not required. Swinney relayed Poague's request to Seavers who denied this request. For weeks Poague worked with a "chronically" ill child at home. This harm is remediable by damages.

HWF eventually allowed Poague to take leave. Within one month of her return from leave HWF placed her on a performance plan, managers "flat out ignored" her when she needed help, managers wrongfully "split" Poague's sales with other Product Specialist costing Poague commission, Managers wrote up Poague for poor sales "each week" in October 2016. Three of those weeks, "not a single other sales associate in her store met sales goals. Yet HWF did not write up or discipline the other underperforming Product Specialists, and Managers rejected Poague's sales but approved other Product Specialists sales at the same profit margin. HWF has no

legitimate non-discriminatory reason for splitting two of Poague's sales in October, 2016. Paogue has no opportunity to show pretext.

## VII.   FLSA

Poague states a claim against HWF for violating Section 7 of the FLSA, codified at 29 U.S.C. §207. Poague was not provided a place "shielded from view" and "free from instruction from… the public" "each time" she needed to pump. Sometimes Swinney allowed Poague to use the manager's office, but other times Swinney only offered the Community Room which was equipped with cameras. IT employees could watch as she pumped. Also, customers shopped in the Community Room for clearance items.  This failure to provide such a room caused Poague to have to clock out, travel home, and split her sales causing a reduction in pay.

## VIII.  ASSAULT AND BATTERY

Plaintiff, Acker states a claim for assault and battery against Swinney. HWF is vicariously liable for Swinney's conduct. Swinney touched Acker three times. Swinney twice touched her breasts. Another time Swinney "put his arm out and touched [Acker's] butt" as he passed her. Because Swinney touched her three different times, the conduct was intentional. Swinney touched these areas without Acker's consent, so he touched her in a "harmful and offensive manner".  Poague complained about Swinney's conduct on behalf of Acker to HWF. HWF should have known the complained about conduct constituted sexual harassment. HWF's

response was not reasonably calculated to stop the behavior. Swinney remained in a managerial position after Poague complained on Acker's behalf.

## IX.      NEGLIGENT AND WANTON HIRING, TRAINING, AND SUPERVISION

Acker states a claim against HWF for negligent and wanton hiring, training and supervision. Swinney committed the tort of assault and battery. HWF had both actual knowledge of Swinney's behavior. Poague complained on behalf of Acker. HWF made a conscious decision to downplay the sexual harassment complaint knowing that to do so would likely result in Swinney mistreating a female customer or employee.  HWF waited months to terminate Swinney. Seavers, HWF's Director of Stores, admits HWF took no action to ensure that its employees did not experience discrimination, harassment or retaliation.

## X- DAMAGES

Plaintiffs Poague, Acker and Bishop each claim lost wages (both back pay and front pay with interest), compensatory damages to include damages for emotional distress, humiliation, stress, anxiety, worry, loss of career, loss of benefits, and out of pocket expenses, and punitive damages in an amount to be determined by the jury. Poague also claims liquidated damages as it relates to the FMLA and the FLSA. The Plaintiff is also seeking attorneys' fees and costs of this litigation.

17

Plaintiffs also seek declaratory relief. An actual controversy of justiciable nature exists between Acker and HWF involving the validity of the release drafted by HWF and signed by Acker. On June 19, 2017, Hannan and Seavers met with Acker ostensibly for re-employment, however, the actual purpose of the meeting was to get Acker to sign a release of her pending EEOC charge and subsequent claims. HWF controlled the drafting of the document, the location of the meeting, and the amount of time Acker had to review the document and accept or not accept the document.  During the meeting, Hannan represented himself to be with Human Resources when he presented her the document and told her she had to sign to get her job back. Acker was given 2 seconds per page to read the document. She was not provided an opportunity to read the release or consult with a lawyer regarding the contents. At the time of the signing of the document, HWF, Hannan and Seavers were aware Acker had an EEOC charge against HWF, and were aware there were several females with EEOC charges and claims against HWF represented by counsel. Acker did not have substantial business experience or education. The heavy handed tactics of HWF render the alleged agreement void, voidable or unenforceable. Neither HWF or Swinney have a business relationship with Ashley Homestore Furniture, Inc. There was lack of mutual assent, lack of consideration, lack of privity, illegality of contract, fraud and coercion, unclean hands, contributory negligence, unconscionability, it is against public policy, neither Swinney or HWF

relied upon the agreement, the acts of HWF and Swinney constituted a waiver, and Acker did not knowingly and voluntarily enter into the agreement to waive any claims against HWF or Swinney. Neither Swinney or HWF suffered any damages. Swinney and HWF are not entitled to legal fees and costs.

The Plaintiff/Counterclaim Defendant, Lorrie Acker denies the allegations asserted by HWF or Swinney and demands strict proof thereof.  She has asserted defenses to the counter-claims, including that there is not a valid contract, neither HWF or Swinney are parties to any agreement Acker signed, the agreement was obtained through fraud and coercion, the agreement was unconscionable, Acker did not knowingly and voluntarily agree to waive any claims against Swinney or HWF, the agreement is against public policy, neither Swinney nor HWF relied on the agreement, neither Swinney nor HWF gave Acker anything of value for the agreement, that HWF willfully concealed facts relating to the agreement, that HWF acted with unclean hands, contributory negligence, the acts of HWF and/or Swinney constituted a waiver, and that neither Swinney nor HWF suffered any damages. She denies the defendants are entitled to legal fees and costs.

   d. <u>Defendants' Defenses.</u>

Huntsville Wholesale Furniture, Inc. *d/b/a* Ashley Furniture Homestore ("HWF") and Taylor Swinney ("Swinney") deny all of the allegations and claims by plaintiffs Michelle Poague ("Poague"), Lorrie Acker ("Acker") and KaTarda Bishop

("Bishop"). HWF denies that plaintiff Poague was subjected to pregnancy discrimination or was not provided break time to breast feed or pump or a satisfactory location in which to do so. HWF denies that it delayed or interfered with Poague's alleged need for Family Medical Leave Act ("FMLA") leave or retaliated against her for requesting or taking such leave. HWF denies that that the plaintiffs, or any employees of HWF, were subjected to sexual harassment, sex discrimination, or retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. The plaintiffs were not constructively discharged and, instead, each plaintiff resigned in some fashion. The Confidential Settlement Agreement and Full and Final General Release and Settlement Agreement is a valid contract between HWF and Acker, and Acker breached that agreement when she filed this lawsuit against HWF, Swinney, and others. All such counterclaims arose out of a common nucleus of law and fact.

Defendants HWF and Swinney deny that Swinney committed any tortious conduct against any of the plaintiffs or that HWF condoned or ratified any such alleged tortious conduct. Swinney denies that he assaulted or battered plaintiffs Lorrie Acker. HWF and Swinney deny that any of the plaintiffs are entitled to monetary damages, compensatory damages, or punitive damages.

Defendants HWF and Swinney brought a counterclaim against plaintiff Lorrie Acker for breach of contract alleging that Acker breached the Confidential

Settlement Agreement and Full and Final General Release when she brought this lawsuit. Defendants HWF and Swinney brought a counterclaim against plaintiff Lorrie Acker HWF alleging she violated the Alabama Litigation Accountability Act when she brough this lawsuit after having signed the Confidential Settlement Agreement and Full and Final General Release. HWF brought a counterclaim against plaintiff Lorrie Acker for the torts of Suppression and Fraudulent Misrepresentation alleging that she failed to disclose that she had filed a charge of discrimination or that she was represented by counsel when she signed the Confidential Settlement Agreement and Full and Final General Release. .

HWF asserts the *Faragher* affirmative defense and asserts that it took reasonable care to prevent and correct any sexually harassing behavior and the alleged victims failed to take advantage of any preventative corrective opportunities to avoid harm. HWF asserts the affirmative defense that plaintiff Michelle Poague failed to mitigate her damages and alleges that Poague failed to seek gainful employment after she resigned her employment which was unreasonable.

The defendants further contend as follows:

**General Objections to Plaintiffs' Contentions**

The plaintiffs' claims in this lawsuit must be limited to those of which the *Second Amended Complaint* provided fair notice. The defendants object to the plaintiffs seeking to add "new or additional" claims and irrelevant facts and

arguments to this lawsuit through their contentions. The plaintiffs cannot circumvent the consequences of failure to timely amend the complaint by adding new claims or factual bases for a case through the submission of a proposed pretrial order containing them especially when the Defendants object. *Pleming v. Univeral-Rundle Corp.*, 421 F.3d 1354, 1358 (11th Cir. 1998); *Coons v. Georgia Pac. Corp.*, 829 F. 2d 1563, 1568-71 (11th Cir. 1987) (District Court "had not abused its discretion by refusing to consider a plaintiff's unpled claims even through the plaintiff had included the claims in her briefs and discovery requests"). Specifically, the defendants object to the addition of the following claims not fairly encompassed within the *Second Amended Complaint*: (1) all of Poague's contentions and claims concerning promotion to a management position; (2) all of Acker's contentions and claims concerning her work environment after HWF agreed to re-hire her after she signed the Confidential Settlement Agreement and Full and Final General Release on or about June 19, 2017; and (3) all of Acker's contentions and claims concerning HWF's decision to terminate her employment on or about November 15, 2017.

The defendants object to any attempt by the plaintiffs to litigate any claims against former HWF Director of Stores Jason Seavers or HWF attorney Daniel Hannan. Hannan and Seavers are no longer defendants in this case. Specifically, the Court must not allow Acker or Poague to try to revive their conspiracy claim against HWF, Seavers or Hannan pursuant to 42 U.S.C. §1985 as the plaintiffs  attempted

in their summary judgment response. The defendants object to the extent the plaintiffs' contentions fail to comport with the Court's prior rulings on this point.

Furthermore, the defendants specifically object to the plaintiffs' attempt to reassert claims they specifically conceded or abandoned in connection with their summary judgment submissions. The defendants specifically object to the plaintiffs' attempt to revive their Fair Labor Standards Act claims, which were dismissed at summary judgment, by re-casting them as pay discrimination claims. The defendants specifically object to the plaintiffs' attempt to reassert claims on behalf of former plaintiffs Sherita Holley or Lakendria Coleman, who and are no longer plaintiffs in this case. The defendants specifically object to the extent that the plaintiffs' pretrial contentions attempt to revive any claim dismissed in the Court's ruling on summary judgment.

The defendants object to the inclusion in the plaintiffs' contentions of any claim barred by the statute of limitations or which are not actionable because the plaintiffs failed to timely comply with the administrative prerequisites to suit. The defendants further object to the plaintiffs' reliance on information they learned after they left employment with HWF or after the filing of the lawsuit to support claims raised in this action. To the extent the plaintiffs voluntarily sought out or exposed themselves to information in discovery that they now claim as part of a predicate for

a hostile environment claim, that exposure is not fairly attributable to the defendants, but to the plaintiffs' own conduct.

**Multiple Plaintiffs Bringing Suit Does Not Make Liability More Plausible.**

At one time, Poauge and Acker worked for HWF as Product Specialists in the Tuscaloosa, Alabama Store. Bishop was employed by Express Employment Professionals and assigned to work at HWF as a temporary employee in the Cashier position. Although their claims are very different, the plaintiffs elected to bring suit jointly. The fact that multiple plaintiffs brought suit does not mean that it is more likely that any of these claims are valid. The plaintiffs have joined together to try to bolster each other's inadequate claims.

**Plaintiff Poague's Pregnancy Discrimination Claim Lacks Merit.**

HWF denies that it subjected Poague to pregnancy discrimination. Poague cannot show that she sought an accommodation; that HWF failed to provide any accommodation she sought; or that HWF accommodated employees other than Poague who were similar in their ability or inability to work. HWF permitted Poague to work the schedule she proposed and to take time off to breast feed or pump. HWF provided Poague several satisfactory locations at work where she could feed or pump. Poague preferred to go home to breast feed or pump, and HWF permitted Poague to go home to feed or pump at her discretion. Indeed, during this time period, HWF frequently permitted Poague to leave work for reasons which had nothing to

do with feeding or pumping. For example, HWF routinely permitted Poague to leave work because she claimed she needed to pick up her stepson from elementary school during normal school hours. HWF would have permitted Poague to work up to forty hours per week if she had wanted to do so. In any event, Poague performed so poorly in March and April 2016 that Poague's belated justification that she was working "part time hours" was not a valid excuse for her poor performance.

## Plaintiff Poague's 29 U.S.C. §207(r) Claim Lacks Merit.

HWF denies that it violated 29 U.S.C. §207(r) since it provided Poague several satisfactory locations at work where she could breast feed or pump and permitted Poague adequate break time during which to do so. Swinney told Poague she could breast feed or pump wherever she felt comfortable doing so and offered her several satisfactory locations, one of which was the Community Room, which had a door with a lock and several comfortable couches. Heather Boothe also told Poague she could use her office to breast feed or pump. Since Poague preferred to go home, Swinney permitted Poague to leave work and go home, at her discretion, and gave her sufficient break time consistent with her decision. Poague failed to complain to Swinney or to anyone at HWF above Swinney during the period in which she chose to breast feed her child.

Even if Poague could establish a violation for failure to accommodate, Poague cannot prove damages pursuant to the FLSA because she was always paid well in

excess of the minimum wage during each pay period and cannot show an overtime violation, which counsel admitted did not occur.

**Plaintiff Poague's Family Medical Leave Act (FMLA) Claim Lacks Merit.**

HWF denies that it retaliated against Poague for taking FMLA leave. Poague cannot show any adverse action or causation. Poague performed poorly during March, April, and June 2016, which led HWF and Swinney to place Poague on a performance improvement plan ("PIP"), *before* Poague decided to take leave. Indeed, Poague admitted she decided to take leave after she learned about the PIP and in order to postpone the PIP. The PIP was not an adverse action since the goal of the PIP was to improve Poague's performance and the performance metrics were the same ones every other Product Specialist was expected to meet.

HWF denies that it ever interfered with Poague's desire to take FMLA leave. Poague admitted she never sought FMLA leave prior to mid-June 2016, and only considered FMLA in order to delay being placed on a performance improvement plan ("PIP"). Poague admitted that any delay was at most "a couple of weeks" and that leave began on July 7, 2016, after Poague provided Swinney with a letter. Poague's son's medical records demonstrate that her son's pediatrician never instructed her to take FMLA leave and only supported leave after Poague proposed the idea to him. Even if there was some small delay, HWF permitted to Poague to take leave within the 30-day notice period, so HWF is not liable. Poague's letter in

which she demanded FMLA leave as her right by law stated that, on July 7, 2016, the leave was due to "unforeseen circumstances." Poague's son's medical records confirm that the timing of the leave was her choice and was not an emergency.

**Plaintiffs' Title VII Hostile Work Environment Claims Lack Merit.**

Each of the three plaintiffs assert a single claim for damages allegedly due to a hostile work environment based on sex. HWF denies that the plaintiffs experienced a hostile work environment. HWF denies that the plaintiffs' environment was permeated with severe or pervasive sexual hostility that materially altered the terms and conditions of their employment or created an abusive working environment.

To establish a hostile work environment for his claim under Title VII, each plaintiff must prove that the HWF workplace was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of each plaintiff's employment and create an abusive working environment. The elements of a hostile work environment claim that each plaintiff must prove by a preponderance of the evidence are:

(1)     belongs to a protected group;

(2)     and was subjected to unwelcome harassment;

(3)     based on her sex;

(4)     which was sufficiently severe or pervasive to alter the terms and conditions of his employment and create a discriminatorily abusive working environment;

(5)     that HWF is responsible for such environment under either a theory of vicarious or of direct liability; and

(6)     that she was damaged as a result.

The plaintiffs' allegations of a hostile work environment, accepted as true, fall well short of their burden of proof. The plaintiffs' testimony is vague and conclusory and lacks the specific facts required to prove a hostile work environment. The plaintiffs failed to demonstrate that the alleged behavior was unwelcome; that the plaintiffs subjectively perceived the alleged behavior as severe or pervasive; or that the alleged behavior was objectively severe or pervasive. The plaintiffs also failed provide any basis on which to hold HWF liable for any alleged behavior.

Many of the allegations of harassment identified by the plaintiffs were not based on sex. To the extent they are based on sex, each plaintiff must show that she was aware of the incidents, that is, the sex comments or conduct, at the time plaintiff was employed at HWF. If a plaintiff cannot show that she was aware of the incidents when that plaintiff was employed, plaintiff cannot rely on that evidence to support her case and it cannot be considered as part of that plaintiff's claim against HWF. In considering the totality of the circumstances to determine if the challenged conduct

is objectively severe or pervasive enough to permeate a workplace, the following factors may be considered:

(1)    the frequency of the conduct;

(2)    the severity of the conduct;

(3)    whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and

(4)    whether the conduct unreasonably interferes with the Plaintiff's job performance.

Many of the plaintiffs' allegations are based on comments and incidents each plaintiff heard second-hand through her co-workers and were neither experienced nor witnessed directly by her. This type of second-hand evidence (inadmissible hearsay) should not be permitted, and if it is, the evidence weakens the alleged severity of each plaintiffs' claim. No plaintiff can demonstrate that the alleged harassment was frequent enough, severe enough, or threatening in a way that it unreasonably interfered with her ability to perform her job.

HWF denies actionable harassment occurred. To the extent harassment occurred at all, HWF took steps to investigate, prevent and promptly correct any alleged illegal behavior in the workplace. HWF did not authorize, condone, or ratify any alleged unlawful conduct or statements. The plaintiffs allege both co-worker and supervisor harassment.

Some plaintiffs complain about harassment by individuals holding a supervisory job title but who had no supervisory authority over the particular plaintiff; some plaintiffs complain about harassment by individuals who were their supervisors; and some plaintiffs complain about harassment by coworkers. HWF may be liable for harassment committed by a co-worker (including someone who held the "supervisor" job title, but who did not have supervisory authority over the plaintiff) only if plaintiffs demonstrate that HWF was negligent in failing to prevent harassment from taking place. However, HWF did monitor the workplace, responded to complaints, had a system for registering complaints, and did effectively discourage complaints from being filed. For harassment by a coworker, each plaintiff must prove either actual or constructive knowledge of the employer and each plaintiff cannot do that where HWF did not know or should not have known of the harassing conduct and could not have failed to take prompt remedial action (because HWF was unaware due to plaintiffs' failures to report it). When plaintiffs did report alleged occurrences of harassment, HWF promptly took action to look into, address, and remediate the alleged action.

HWF is not liable for harassment committed by a supervisor if HWF proves its affirmative defense. The plaintiffs unreasonably failed to take advantage of preventative or corrective opportunities provided by HWF relating to alleged harassment. Accordingly, HWF is entitled to the *Faragher/Ellerth* defense. HWF

can demonstrate that it (1) exercised reasonable care to prevent and promptly correct racially harassing behavior; and (2) plaintiffs unreasonably failed to take advantage of preventative or corrective opportunities to avoid or correct harm; or that if the plaintiffs did take advantage, HWF reasonably responded by taking reasonable and prompt corrective action. The plaintiffs' complaints that they desired different or more severe remedial action will not support a conclusion that HWF's response was not reasonable where it appropriately addressed the conduct. HWF's policy allowed victims of alleged harassment to report the occurrence to any supervisor, human resources manager, or manager, and HWF prohibited retaliation for making such complaints. Each plaintiff's failure to report various alleged incidents of harassment satisfies the second element of the defense, which requires proof that the plaintiff "unreasonably failed to take advantage of" HWF's preventive measures, namely its anti-harassment policy.

Many of the alleged instances of sexual harassment asserted by the plaintiffs were never reported to HWF. After Poague failed to meet the PIP goals during October 2016, she complained about a host of issues, many of which were unrelated to any plausible legal claim. Regardless, HWF took prompt, reasonable action to address the occurrences that were plausibly connected to any potential claim of a hostile work environment. Two of the plaintiffs, Acker and Bishop, failed to complain to HWF at all. Indeed, Acker, who was rehired after she signed the

<u>Confidential Settlement Agreement and Full and Final General Release</u>, failed to complain during the second period even after she had filed a charge and allegedly had an attorney. HWF was not negligent in failing to prevent an alleged hostile work environment.

Each plaintiff attempts to rely in part on other employees' alleged experiences and on gossip. <u>Each</u> plaintiff must, however, establish her own claim for hostile work environment based on what she experienced. Under the totality of the circumstances, a reasonable person could not conclude that the alleged comments and conduct that each plaintiff allegedly witnessed or experienced during her employment were so frequent, severe, threatening or humiliating, or job interfering as to materially alter the terms and conditions of each plaintiff's employment and create an unlawfully discriminatory abusive working environment.

HWF incorporates any and all defenses asserted in its Answer or any of HWF's pleadings. To the extent the plaintiffs allege they were subjected to unlawful harassment occurring prior to June 11, 2016, such allegations are barred by the applicable statute of limitations. The plaintiffs' claims of harassment are further barred in whole or in part by the doctrines of waiver, estoppel, and unclean hands to the extent they failed to complain about alleged harassment or discrimination, failed to take reasonable steps to avoid alleged harassment or discrimination, or engaged in harassment or discrimination.

## **Plaintiffs' Disparate Treatment Claims Lack Merit.**

HWF denies that it discriminated against any of the plaintiffs because of their sex. The defendants object to the plaintiffs' contentions to the extent that the plaintiffs make unfocused allegations of disparate treatment without specific evidence of a specific instance of disparate treatment. The very nature of disparate treatment claims, such as the ones Poague and Acker bring in this lawsuit, is that an employee contends that a defendant subjected *her specifically* to treatment that was different than the treatment that employees of another sex who were similarly situated received. The plaintiffs' focus must be proving that each of them *personally and individually* experienced different treatment because of sex. The plaintiffs should not be litigating the claims of other employees who share their sex or other employees who they believe the defendants treated unfairly. This case should not be allowed to devolve into the trial of dozens of claims regarding employees who are not plaintiffs in this action. This case involves the claims of three individual plaintiffs bringing suit together. This is not a class action. The plaintiffs have no representative capacity or standing to argue for what they consider to be the rights of others. There is very limited relevance to information regarding the treatment of other female employees not parties to this case. The degree to which the plaintiffs rely on the treatment of others is improper and prejudicial to the defendants. The

defendants object to the plaintiffs' contentions to the extent that the rely on things that happened to people other than the plaintiffs.

HWF denies it discriminated against Poague or Acker by reducing or limiting their opportunities to make sales. HWF had limited control over sales opportunities, which are inherently speculative rather than certain and, as such, is not an adverse action as a matter of law. Poague and Acker have not and cannot identify specific sales which were not approved or that the reason any specific sales was not approved was intentional discrimination.

HWF denies that the "ups" rotation was administered in a discriminatory manner, which in any event is not an adverse action as a matter of law. Poague and Acker cannot identify specific instances of disparate treatment compared to similarly situated male employees and so cannot prove this claim. Bishop was a temporary employee of Express Employment Professionals assigned to work at HWF as a Cashier and did not earn commission on sales.

HWF denies that Poague was not paid any money, such as commissions or bonuses, to which she was entitled or eligible on a discriminatory basis. HWF denies that it delayed delivery of any furniture items on a discriminatory basis. HWF denies that Poague was treated differently with regard to smoke breaks, which is not a protected characteristic, or that HWF treated male employees more favorably than female employees with regard to smoke breaks.

The defendants specifically object that Poague failed to satisfy administrative prerequisites for a promotion claim and failed to plead a promotion claim in her *Second Amended Complaint*.

The defendants specifically object that Acker failed to satisfy administrative prerequisites for a termination claim for her second term of employment with HWF and failed to plead a termination claim for her second term of employment with HWF in her *Second Amended Complaint*.

The defendants specifically object to the plaintiffs' attempt to revive their Fair Labor Standards Act claims, which were dismissed at summary judgment, by re-casting them as pay discrimination claims. The defendants object that Poague failed to satisfy administrative prerequisites for or to plead a pay discrimination claim and failed to plead a pay discrimination claim in her *Second Amended Complaint*

**Plaintiffs' Title VII Retaliation Claims Lack Merit.**

HWF denies it retaliated against any of the plaintiffs. HWF denies it retaliated against Bishop by reducing her hours. This argument misconstrues the substance of Bishop's alleged complaint, which was not sufficient notice of an allegation of sexual harassment and cannot be construed as a good faith complaint of discrimination. Bishop never complained of discrimination; cannot show any adverse action; and asked to be reassigned to another company.

HWF denies it retaliated against Poague in any way. Poague cannot show any adverse employment action and resigned her position on February 17, 2017. Poague's allegations of harassment distort the evidence, particularly her deposition testimony, and rely upon her sham declaration. In particular, Poague's audio recording of her meeting with Swinney shows Poague was vulgar and insubordinate. Doc. 126, Ex. 56.

HWF denies that Poague was not paid any money, such as commissions or bonuses, to which she was entitled or eligible as retaliation. HWF denies that it delayed delivery of any furniture items on a discriminatory basis.

The defendants specifically object that Acker failed to satisfy administrative prerequisites for a termination claim for her second term of employment with HWF and failed to plead a termination claim for her second term of employment with HWF in her *Second Amended Complaint*.

**Plaintiffs' Constructive Discharge Claims Lack Merit.**

HWF denies Poague, Acker, or Bishop were constructively discharged. Poague resigned because she was upset after being disciplined for being insubordinate and for failure to report to work as scheduled. Bishop was employed by Express Employment Professionals and asked for a new assignment. Acker walked off the job and admitted the reason was her belief that Swinney would not support her sales efforts and for no other reason.

The defendants specifically object that Acker failed to satisfy administrative prerequisites for a termination claim for her second term of employment with HWF and failed to plead a termination claim for her second term of employment with HWF in her *Second Amended Complaint*.

**Plaintiffs Acker's Assault and Battery Claim Lacks Merit.**

Swinney denies he committed assault and battery against Acker. Swinney disputes Acker's characterization of virtually all relevant contentions. Even if Acker's contentions are accepted as true, her claims fail as a matter of law. Acker contends that Swinney allegedly touched her on three separate occasions, each about one month apart but those incidents were not intentional and were accidental or inadvertent. Acker contends that Swinney brushed against her, each time for less than one second. Acker admitted Swinney did not make any hostile or sexual comments to her at the time. Acker also admitted she did not complain to anyone at HWF about the incidents at the time or at any time during her employment with HWF.

**Plaintiff Acker's Negligent or Wanton Hiring, Training and Supervision Claim Lacks Merit.**

HWF denies Swinney committed any tortious conduct and denies that it ratified or adopted any specific tortious conduct. Acker failed to complain to HWF or to provide HFW with sufficient notice of her allegations that Swinney assaulted

or battered her. Poague's complaints to HWF failed to provide HWF with sufficient notice of any allegations that Swinney allegedly committed assault or battery against Acker. To the extent Poague complained to anyone at HWF about Swinney, such as about her characterization of their December 31, 2016 meeting, Poague's audio recording of that meeting demonstrate that Poague's allegations about Swinney are false.

## Plaintiffs Are Not Entitled to Damages.

Plaintiff Michelle Poague's claims for damages are barred since she failed to act reasonably to mitigate her damages. The plaintiffs are not entitled to monetary damages, including medical or emotional distress, because the plaintiffs have not suffered any tangible employment action, physical injury, or lost wages at the hands of HWF.

Poague has sought to blame HWF and Swinney for her son's developmental issues, including his slow growth and speech problems. The plaintiffs have not identified an expert witness, and Poague's speculation is insufficient to prove causation. Poague's son's medical records also fail to support her theory of causation. The pediatrician's records from June 23, 2016 merely reflect that her son was small but with a consistent growth curve. Poague's admitted history of smoking, alchohol abuse, and illegal drug use, as well as the fact that she was anemic during

her pregnancy, make it impossible for Poague to prove any damages as a matter of law.

Poague has diagnosed mental health problems unrelated to her employment with HWF or any contact with Swinney. Poague has received mental health treatment for many years for reasons relating to events which occurred well before she was hired to work at HWF or came into contact with Swinney. Poague's treatment records make it clear that her depression and anxiety manifested because she stopped taking medication, returned after she had been on FMLA leave for two months, and subsided less than two weeks after she returned to work. Poague did not experience emotional distress which is reasonably attributed to the work environment at HWF or Swinney specifically.

Poague has struggled with interpersonal relationships. These problems did not grow out of her employment at HWF, but certainly infected the workplace by coloring the view Poague had of every event. While it may be that Poague cannot control the way she sees the world, her medical records call into question the reasonableness of her perceptions and her interpretation of events. The records demonstrate even further why Poague was not a suitable candidate for a management position, if she had ever sought promotion to one. Moreover, these records also show that the very emotional damages which Poague claims this lawsuit existed long before the events giving rise to this lawsuit and have root causes unrelated to

tefendants or their actions. Poague's claims for compensatory damages are limited to "garden variety damages" at most.

Acker has attempted to blame HWF and Swinney for her gastrointestinal issues. The plaintiffs have not identified an expert witness, and Acker's speculation is insufficient to prove causation. Acker's medical records demonstrate that her gastrointestinal issues have continued well after her employment with HWF ended and any contact she had with Swinney ceased. Acker's claims for compensatory damages are limited to "garden variety damages" at most.

Bishop failed to provide any evidence of damages and so her claims for compensatory damages are limited to "garden variety damages" at most.

This lawsuit is in court *not* because HWF is a terrible workplace infected with sexism, but rather because disgruntled, subpar employees have decided that someone else must be to blame for their failure to succeed in their positions or, in the case of Poague, for disciplinary problems they did earn. The defendants have not wronged or harmed the plaintiffs. The plaintiffs are not entitled to any relief under any law.

HWF at all times acted in good faith and without retaliatory or discriminatory intent. Any alleged discriminatory decisions by HWF or its employees or agents would be contrary to its good faith efforts to comply with the law, rules and regulations. All of HWF's decisions and/or actions with regard to the plaintiffs, if any, were undertaken for legitimate, non-discriminatory, non-retaliatory reasons.

40

The plaintiffs cannot demonstrate that HWF (or any managerial capacity employee) acted with actual malice or reckless indifference to the plaintiffs' federally protected rights.

The plaintiffs' claims for punitive and mental anguish damages are barred because any imposition of such damages against HWF would constitute a denial of due process and would be excessive under the United States and the Constitution of Alabama. The plaintiffs' claims for punitive damages are barred further because the acts, if any, and omissions, if any, of HWF, which are specifically denied, fail to rise to the level required to sustain a reward of punitive damages, were trivial and isolated, were not motivated by evil intent or discrimination, do not evidence a malicious, oppressive or fraudulent intent to deny the plaintiffs' their protected rights or to harass or to otherwise discriminate against the plaintiffs, and are not so wanton and willful as to support an award of punitive damages. The plaintiffs' claims for punitive damages are barred because HWF did not act knowingly, willingly, recklessly or with indifference to the Plaintiffs' federally protected rights. HWF cannot be held liable for punitive damages because any wrongful conduct was contrary to HFW's good faith efforts to comply with the law. HWF asserts all substantive and procedural limitations imposed on the order of punitive damages under the United States Constitution, as enunciated in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996) and *State Farm Auto Mut. Ins. Co. v. Campbell*, 538

U.S. 408 (2003). HWF cannot be held liable for punitive damages because the individual or individuals who committed the alleged racially harassing behavior were not employed in a managerial capacity such that their actions may be imputed to HWF. The plaintiffs' claims for punitive damages violate the United States and Alabama constitutional protection from, including without limitation, excessive fines, cruel and unusual punishment, denial of due process, and denial of equal protection of the law. The procedures by which damages for mental anguish are awarded to the plaintiffs violates the due process rights secured to HWF by the laws and Constitutions of the United States and of the State of Alabama in that these procedures deprive HWF of its property without due process of law by allowing the jury unbridled discretion without adequate criteria, standards, or guidelines by which to render such an award, thereby precluding the jury from determining what quality or quantity of evidence is necessary to justify an award of damages for mental anguish, allowing the jury to speculate, based on conjecture and without substantial evidence, and allowing the jury to render an arbitrary and capricious award. Further, it does not provide HWF with fair notice of what conduct will subject it to liability nor the severity of the damages and there is no meaningful standard for judicial review of the award post-verdict to insure that the award does not exceed constitutional limitations.

The defendants claim a setoff for all money received by any plaintiff in settlement with other entities as a result of any settlement of claims at issue in this action or reserve the right to introduce evidence of the settlement(s) to the jury at trial.

           e.      Defendants' Counterclaims

**Defendants' Breach of Contract Counterclaims Against Plaintiff Lorrie Acker**

Defendants HWF and Swinney have alleged counterclaims against plaintiff Lorrie Acker for breach of contract. Under Alabama law, a breach of contract claim requires proof of "(1) the existence of a valid contract binding the parties in the action, (2) [the plaintiff's] own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *S. Med. Health Sys., Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995). The <u>Confidential Settlement Agreement and Full and Final General Release</u> is a valid agreement which Acker read and signed. Acker was provided ample time to consider the agreement and was free to call her lawyer or take the agreement with her for her lawyer to review if she desired. Swinney was an intended beneficiary of the agreement as a former employee. Counterclaim plaintiff HWF fulfilled its obligation since it hired Acker and employed her for several months after the agreement, until she was discharged for misconduct. Counterclaim defendant Acker failed to perform as she failed to dismiss her charge of discrimination, as required by the contract, and instead proceeded to file the

instant lawsuit. Both counterclaim plaintiffs, HWF and Swinney, have been damaged as they have incurred substantial attorneys' fees defending against Acker's claims in the instant lawsuit.

HWF and Swinney deny that the agreement was obtained through fraud or coercion, that the agreement was unconscionable, that Acker did not knowingly and voluntarily agree to waive any claims against HWF or Swinney, that the agreement is against public policy, that HWF or Swinney relied on the agreement, that HWF or Swinney did not give Acker anything of value for the agreement, that HWF willfully concealed facts relating to the agreement, that HWF acted with unclean hands, that contributory negligence was involved, and that the acts of HWF and/or Swinney constituted a waiver. HWF and Swinney suffered actual damages.

## Defendants' Counterclaim for Violation of the Alabama Litigation Accountability Act against Plaintiff Lorrie Acker

Plaintiff Lorrie Acker signed the <u>Confidential Full and Final Settlement Agreement and General Release</u>, which applied to both HWF and Swinney, and subsequently brought a civil action, or asserted a claim therein, or interposed a defense, which lacked substantial justification, either in whole or part.

## HWF's Suppression and Fraudulent Misrepresentation Counterclaims Against Plaintiff Lorrie Acker

HWF alleges that Acker is liable for the torts of Suppression and Fraudulent Misrepresentation.  When HWF attorney Daniel Hannan and Director of Stores

Jason Seavers met with Acker and before she signed the <u>Confidential Settlement Agreement and Full and Final General Release</u>, Hannan asked Acker (1) whether she was represented by counsel and (2) whether she had filed a charge of discrimination against HWF. Acker answered "no" to both questions. The correct answer was "yes" since Acker had engaged attorney Patricia Gill who filed a charge of discrimination on her behalf with the EEOC.

Since Hannan asked Acker for this information, Acker had a duty to disclose the information based on the circumstances and the fact that Hannan asked Acker for the information. Acker suppressed this information, which was material to HWF's decision to permit her to sign the <u>Confidential Settlement Agreement and Full and Final General Release</u> and to permit Acker to return to work at HWF. Acker had actual knowledge that she had retained counsel and that counsel had filed a charge of discrimination with the EEOC on her behalf. Finally, HWF suffered actual damages because it hired Acker and paid her wages for six months. The Suppression also amounted to a Fraudulent Misrepresentation since the information Acker suppressed was material, and HWF would not have permitted Acker to sign the <u>Confidential Settlement Agreement and Full and Final General Release</u> and would not have permitted Acker to return to work if she had provided accurate information. Acker was not eligible for rehire since she had walked off the job without notice and

for no good reason, and HWF made an exception and rehired her in exchange for her agreement to sign the Confidential Full and Final General Release.

### HWF's *Faragher* Defense

HWF took reasonable care to prevent and correct any sexually harassing behavior and the alleged victims failed to take advantage of any preventative or corrective opportunities to avoid harm. HWF is not liable to Poague, Acker or Bishop for any alleged harassment by Store Manager Taylor Swinney or Sales Manager James Riggsby because HWF took reasonable care to prevent and correct any sexually harassing behavior. HWF is not liable to Acker she failed to complain to HWF about sexual harassment during her employment. HWF is not liable to Bishop because she failed to complaint to her employer, Express, or to HWF about sexual harassment during her employment.

### HWF's After-Acquired Evidence Defense Against Poague and Acker.

HWF had a host of legitimate, non-discriminatory reasons to terminate plaintiff Michelle Poague, including but not limited to her disruptive behavior, surly attitude, foul mouth, and consistently poor work performance. HWF could have terminated Poague when she: (1) misrepresented her pediatrician's records and fraudulently requested FMLA leave; (2) sent insubordinate texts to Swinney during September 2016; (3) failed to meet KPIs during March, April, June and October 2016; (4) left work without permission on December 31, 2016; (5) yelled and cursed

at Swinney during their meeting on January 1, 2017; (6) failed to report for work as scheduled during February 2017; and (7) sent insubordinate texts to Swinney because he disciplined her. If Poague had not resigned before she filed suit, HWF could have terminated her for: (1) lying about Swinney's behavior after their January 1, 2017 meeting; (2) insubordinate behavior during that meeting; (3) insubordinate and abusive behavior toward Swinney via text messages during March 2017; (4) abusive behavior toward Heather "Nikki" Boothe via Facebook messages during November 2018; and (5) witness tampering for the same Facebook messages. As such, the plaintiffs cannot demonstrate that HWF cannot prove an After-Acquired Evidence defense.

Plaintiff Acker was terminated because she walked off the job, which she admitted to doing during her re-employment interview, in a declaration she signed during that interview, and in her deposition testimony in this case.

**HWF's Failure to Mitigate Defense**

Plaintiff Poague voluntarily resigned her position with HWF. Poague admitted that she had intended to leave HWF and Tuscaloosa during May 2017 and then failed to look for work for two years afterwards. Poague's failure to seek gainful employment after she resigned her employment with HWF was unreasonable failure to mitigate her alleged damages in this case.

e.     Defenses to Counterclaims

47

Acker denies all allegations and claims by HWF and Swinney. She has asserted defenses to the counter-claims, including that there is not a valid contract, neither HWF or Swinney are parties to any agreement Acker signed, the agreement was obtained through fraud and coercion, the agreement was unconscionable, Acker did not knowingly and voluntarily agree to waive any claims against Swinney or HWF, the agreement is against public policy, neither Swinney nor HWF relied on the agreement, neither Swinney nor HWF gave Acker anything of value for the agreement, that HWF willfully concealed facts relating to the agreement, that HWF acted with unclean hands, contributory negligence, the acts of HWF and/or Swinney constituted a waiver, and that neither Swinney nor HWF suffered any damages. She denies the defendants are entitled to legal fees and costs.

## I.   __BREACH OF CONTRACT__

Most of Acker's federal claims arise under Title VII. Court's enforce waivers of Title VII claims only if the waivers are knowing and voluntary. The release was not knowing and voluntary. HWF gave Acker little time to read or consider the General Release. Acker was just told "Sign this, and you can have your job back". Acker was given less than two seconds per page to review the contents. Hannon gave Acker each page and told her where to sign, then took it back. Acker never consulted with her attorney before signing it. Acker did not understand the document.

Alabama courts usually enforce unambiguous releases, and only consider the release's text unless there is fraud. HWF fraudulently induced Acker to sign the General Release. Hannan falsely introduced himself as human-resources when he was, in fact, the attorney defending her claims asserted in her EEOC charge. Acker would not have signed the release, at least without consulting her lawyers, had she known Hannan was actually HWF's attorney.

Ashley Furniture Homestore, Inc. lacks standing to pursue any contract claim because it is a foreign entity that is not formed or existing under Alabama law. There is no business relationship between HWF or Swinney and Ashley Furniture Homestore, Inc. and there is no evidence either HWF or Swinney had any relationship that constituted "predecessors, successors, assigns, officers, directors, agents, employees and all affiliated parent or subsidiary companies or divisions" of Ashley Furniture Homestore, Inc.

Swinney does not have privity of contract with HWF as he was no longer employed with HWF at the time the release was signed. The General Release does not apply to prospective Title VII claims. Acker's FLSA claim cannot support a breach of contract claim because the Secretary of Labor did not supervise the settlement, and/or a Federal District Court Judge did not approve the settlement either inside or outside the adversarial context. Further, the release prohibited Acker from serving as a witness which is illegal and can been seen as witness tampering.

## II.    MISREPRESENTATION AND SUPPRESSION

Acker is not liable for misrepresentation or suppression. Hannan never asked Acker if she filed an EEOC charge against HWF nor did he ask Acker if she had counsel. Regardless, the statements are not material. Seavers stated a pending EEOC charge would not disqualify an employee from reemployment. Seavers stated he was unaware of any evidence or facts HWF learned through the litigation that had it known at the time it hired and/or employed Acker would have led it to terminate and/or not rehire her so it cannot be material. After HWF confirmed the fact Acker did have a pending EEOC charge, and learned she was represented by counsel, (both bits of information it already had in its possession when the paperwork was signed) it had her come in and sign employment papers establishing the statements were not material. Thus, it had equal knowledge that Acker had a lawyer and active legal claims. HWF did not rely on any representations of Acker as it continued to employ Acker despite its already equal knowledge of Acker's claims and representation.

## III.    ALABAMA LITIGATION ACCOUTABILITY ACT

Acker is not liable to the Defendant's for attorney's fees pursuant to the Ala. Code §12-19-271 (2020). Acker's claims are asserted with substantial justification. Her claims survived a motion to dismiss and a motion for summary judgment. As stated above, the release is not valid and enforceable.

(6)    DISCOVERY AND OTHER PRETRIAL PROCEDURES:

a.      Pretrial Discovery.

Pursuant to previously entered orders of the court, discovery is closed.

b.      Pending motions.

None.

c.      Most evidentiary issues may be resolved through a stipulation of the parties. A *motion in limine* should be filed only if there is a genuine disagreement. Prior to filing any *motion in limine*, moving counsel shall contact the opposing counsel and determine if there will be opposition to the motion. All motions in limine shall include, in the caption under the case number, a notation that motion is "Opposed" or "Unopposed." In additional, the first paragraph SHALL briefly summarize the parties' attempt to resolve the issue and set forth areas of agreement and disagreement. If the motion is opposed, the court will withhold ruling on the motion for a period of three business days to permit opposing counsel time to submit a response to the motion. The court may enter a briefing schedule for a particular motion which will supersede this general schedule. Motions in limine must be filed at least one week in advance of the scheduled trial date and shall be accompanied by supporting memoranda.

(7)    <u>TRIAL (JURY):</u>    At least ten business days prior to the scheduled trial date, the parties must file a single, joint proposed jury charge, including all necessary instructions, or definitions applicable to the specific issues of the case. The parties need not submit standard generic instructions regarding routine matters, e.g., burden of proof, credibility of witnesses, duty of jurors, etc.

a.      In joint, proposed jury materials, counsel are to include all necessary instructions or definitions, specifically including (1) the prima facie elements of each cause of action and defense asserted; (2) legal definitions required by the jury; (3) items of damages; and (4) methods of calculation of damages. Counsel

51

are to use the 11th Circuit Pattern Jury Instructions, or appropriate state pattern jury instructions, as modified by case law or statutory amendments, wherever possible. Any deviations must be identified and accompanied with legal authorities for the proposed deviation.

b.   Even if the parties, in good faith, cannot agree on all instructions, definitions, or questions, the parties should nonetheless submit a single, unified charge. Each disputed instruction, definition, or questions should be set out in bold type, underline or italics and identified as disputed. Each disputed item should be labeled to show which party is requesting the disputed language. Accompanying each instruction that deviates from pattern charges shall be all authority or related materials upon which each party relies. The parties shall also submit a copy as an e-mail submission to coogler_chambers@alnd.uscourts.gov.

c.   If the verdict form will include special interrogatories for the jury to answer, counsel shall include such special interrogatories with their proposed jury instructions.

(8)   <u>TRIAL DATE:</u> This case is set for trial (jury) on January 11, 2021.

It is ORDERED that the above provisions be binding on all parties unless modified by further order for good cause shown.

**DONE** and **ORDERED** on December 8, 2020

_____
L. Scott Coogler
United States District Judge

173538

52